[No. D049800. Fourth Dist., Div. One. Feb. 28, 2008.]

JULIE PUENTES et al., Plaintiffs and Appellants, v.
WELLS FARGO HOME MORTGAGE, INC., Defendant and Respondent.

## COUNSEL

Blumenthal & Nordrehaug, Norman B. Blumenthal and Kyle R. Nordrehaug for Plaintiffs and Appellants.

Sheppard, Mullin, Richter & Hampton, Edward D. Vogel, Karin Dougan Vogel, Erik S. Bliss and Vincent J. Brown for Defendant and Respondent.

Phyllis K. Slesinger for Mortgage Bankers Association as Amicus Curiae on behalf of Defendant and Respondent.

Leland Chan for California Bankers Association as Amicus Curiae on behalf of Defendant and Respondent.

OPINION

**McCONNELL, P. J.**—Plaintiffs Julie and Kenneth Puentes[1] appeal a summary judgment for defendant Wells Fargo Home Mortgage, Inc. (Wells Fargo), entered after the trial court determined that as a matter of law they cannot maintain their claim under California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.).[2] As the predicate act for their UCL claim, the Puenteses contend Wells Fargo's calculation of interest due under their home mortgage on prepayment during a partial year breached the terms of the promissory note. They also contend the court erred by finding the matter is preempted by federal regulations. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Wells Fargo is a nationwide mortgage lender. In mid-August 2002 Kenneth took out a conventional 30-year fixed-rate mortgage with Wells Fargo to secure a $274,000 loan. The promissory note was on a multistate uniform instrument approved by the Federal National Mortgage Association (known as Fannie Mae) and the Federal Home Loan Mortgage Corporation (known as Freddie Mac). The note provided, "Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.500 [percent]." The note called for equal monthly payments of $1,731.87 to commence on October 1, 2002. It allowed the prepayment of principal without penalty, but prepayment was contingent on all monthly payments being current.

Kenneth also signed a Truth in Lending Act (TILA) (15 U.S.C. § 1601 et seq.) disclosure statement, which provided the annual percentage rate of interest (APR) on the loan was 6.512 percent.[3] The TILA disclosure statement also disclosed the loan was to be repaid in equal monthly payments, and "[i]f you pay off your loan early you will not receive a refund of the part of the finance charge that you have already paid."

Wells Fargo subsequently sold Kenneth's mortgage to Freddie Mac on the secondary market, but it continued to service the loan.

On March 14, 2003, just seven months into the loan period, the Puenteses prepaid the note's principal balance. In determining the amount of interest owed to retire the obligation, Wells Fargo treated February, as it did for each

---

[1] We are required to refer to Kenneth Puentes individually, and to avoid confusion we use his first name.

[2] Statutory references are to the Business and Professions Code unless otherwise specified.

[3] The additional .012 percent in the APR reflects a $350 settlement and closing fee that was calculated as a finance charge.

of the previous full months of the loan, as one-twelfth of a year, or approximately 30.4 days. For the partial month of March, it charged interest on a per diem basis.

In January 2004 the Puenteses filed a proposed class action against Wells Fargo for unfair business practices (§ 17200 et seq.). The following May they filed a first amended complaint (hereafter complaint), which sought redress for the Puenteses and a class of similarly situated consumers who within the previous four years paid Wells Fargo "interest for non-existent days . . . in the year of early pay off of their residential mortgage loan." The complaint alleged Wells Fargo concealed that it charged mortgage interest on the basis of a 30.4-day month rather than actual days in each month. The complaint prayed for restitution and injunctive relief. In May 2006 the court granted the Puenteses' motion for class certification.

In July 2006 Wells Fargo moved for summary judgment. It argued its interest calculation was consistent with the terms of the note, federal regulations and the uniform nationwide practice of the mortgage industry, and thus as a matter of law cannot constitute an unfair business practice under the UCL.

The Puenteses recalculated the monthly interest payments to show Wells Fargo's method resulted in charges for 182.5 days during the five full months of the loan instead of the actual 181 days. They argued that by using a fictitious 30.4-day month during the year of loan payoff, Wells Fargo overcharged them $71.98 in interest for days not actually in the loan period, thereby breaching the promissory note by imposing a yearly interest rate of approximately 6.549 percent, or alternatively, the $71.98 was a prepayment penalty.

After a September 2006 hearing, the court granted Wells Fargo's motion on the grounds the action is preempted by federal regulations, and Wells Fargo's interest calculation was based on a reasonable interpretation of the term "yearly rate" in the note, comported with industry standards, and was not an unfair business practice. The Puenteses unsuccessfully moved for reconsideration, and judgment was entered for Wells Fargo on November 8, 2006. On the same date, the class was decertified pursuant to stipulation.

## DISCUSSION

### I

### *Standard of Review*

"Where, as here, the material facts are not in dispute and the parties simply dispute the legal significance of the facts, the matter may be resolved on

summary judgment as a matter of law." (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1028 [65 Cal.Rptr.3d 326].) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings . . . to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

We review the trial court's ruling on a summary judgment motion independently, considering all the evidence set forth in the moving and opposing papers except that to which objections have been sustained. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1472 [38 Cal.Rptr.3d 653].) "Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the 'moving party is entitled to a judgment as a matter of law' (Code Civ. Proc., § 437c, subd. (c)), the court must grant the motion for summary judgment." (*Ibid.*) "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).)

## II

### *Wells Fargo's Interest Calculations Did Not Violate the UCL as a Matter of Law*

#### A

The Puenteses contend that in calculating interest due on payoff, Wells Fargo breached the terms of the promissory note, and concomitantly violated the UCL. They assert that consistent with California law, the term "yearly rate" means interest will be charged on a per diem basis for 365 days, and thus Wells Fargo may not charge interest based on the fictional 30.4-day month. The Puenteses cite Government Code section 6803, which provides in part: " 'Year' means a period of 365 days . . . ." They also cite *Chern v. Bank of America* (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310], in which our Supreme Court held that as "commonly understood, a year has either 365 or 366 days." (See also *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 448 [153 Cal.Rptr. 28, 591 P.2d 51].)

The UCL does not proscribe specific activities, but broadly prohibits "any unlawful, unfair or fraudulent business act or practice and unfair,

deceptive, untrue or misleading advertising." (§ 17200.) The UCL "governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) " 'Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Ibid.*)

█ In drafting the promissory note and amortization schedule, and in calculating interest, Wells Fargo followed "Regulation Z," which implements TILA (15 U.S.C. § 1601 et seq.). (12 C.F.R. § 226 et seq. (2007).)[4] Regulation Z's appendix J requires that lenders use certain formulas for computing interest at a yearly rate, based on the common period, or "unit-period," that occurs most frequently in the transaction. (12 C.F.R. §§ 226, appen. J(b)(3)(ii), (4)(i), 226.22(a) (2007).) Here, the unit-period was a month as the promissory note and TILA disclosure statement called for monthly payments. When the unit-period is a month, "there are 12 unit-periods per year" (12 C.F.R. § 226, appen. J(b)(5)(ii)), and despite the irregularity of the actual number of days in a month, "[a]ll months shall be considered equal." (*Id.,* appen. J(b)(3)(iv).)

█ Wells Fargo contends that since its interest calculations are pursuant to federal regulations, its practice is not actionable. When "the Legislature has permitted certain conduct, 'courts may not override that determination' by declaring such conduct to be actionable under . . . section 17200." (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 169 [114 Cal.Rptr.2d 109].) To forestall an action under the UCL, "another provision must actually 'bar' the action or clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." (*Cel-Tech, supra,* 20 Cal.4th at p. 183.) The Puenteses submit that Regulation Z does not preclude their action because it pertains only to disclosures required by the TILA, it does not pertain to the calculation of interest due on prepayment, and that calculation

---

[4] "Congress enacted TILA in 1968 'to protect consumers' choice through full disclosure and to guard against the divergent and at times fraudulent practices stemming from uninformed use of credit. [Citations.]' [Citation.] The stated congressional purpose behind TILA is 'to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.' " (*Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1349 [42 Cal.Rptr.3d 283].)

is controlled by the contract terms and state law. Among other things, they cite Regulation Z's requirement that a creditor disclose "that the consumer should refer to the appropriate contract document for information about nonpayment, default, the right to accelerate the maturity of the obligation, and prepayment rebates and penalties." (12 C.F.R. § 266.18(p) (2007).) They also cite Fannie Mae guidelines that provide lenders must use its standard form contracts, but "[i]n some cases, the mortgage forms may have to be adapted to meet the lender's or local jurisdictional requirements."

We need not resolve the issue, however, or determine whether there was a breach of contract under California law, because even if the term "yearly" ordinarily means 365 days, Wells Fargo's interest calculations may not be a predicate for a UCL action as a matter of law. "[A] breach of contract may . . . form the predicate for Section 17200 claims, *provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent.'* " (*Watson Laboratories, Inc. v. Rhone-Poulenc Rorer* (C.D.Cal. 2001) 178 F.Supp.2d 1099, 1117, fn. 12, italics added; see *Smith v. Wells Fargo Bank, N.A., supra,* 135 Cal.App.4th 1463, 1483.) The Puenteses contend Wells Fargo's practice is fraudulent and unfair.

### B

The term "fraudulent" as used in section 17200 "does not refer to the common law tort of fraud but only requires a showing members of the public ' "are likely to be deceived." ' " (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 839 [33 Cal.Rptr.2d 438]; see *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1147 [135 Cal.Rptr.2d 796].)[5] Unless the challenged conduct " 'targets a particular disadvantaged or vulnerable group, it is judged by the effect it would have on a reasonable consumer.' " (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 806 [49 Cal.Rptr.3d 555].)

Since the promissory note called for monthly payments of principal and interest in equal amounts, Wells Fargo's interpretation of the note's term "yearly rate" to denote monthly interest based on one-twelfth of a year was reasonable and not likely to deceive members of the public. Further, the note cautioned that while prepayment was allowed, it was contingent on all monthly payments being current, and thus a reasonable consumer would not expect the recalculation of interest payments based on actual days of the month, or any refund of interest, at the time of prepayment. Further, the TILA

---

[5] Although the issue of whether a practice is deceptive or unfair is generally a question for the trier of fact, the matter may be disposed of by summary judgment on undisputed facts. (*Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 134–135 & fn. 9 [61 Cal.Rptr.3d 221].)

statement disclosed, "If you pay off your loan early you will not receive a refund of the part of the finance charge that you have already paid."

C

1

The proper definition for the term "unfair" in a consumer action is uncertain. In *Cel-Tech,* the California Supreme Court held that in the context of an unfair competition claim by a competitor, the term "unfair" in section 17200 "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra,* 20 Cal.4th at p. 187.) The court also held that "to guide courts and the business community adequately and to promote consumer protection, we must require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186–187.)

The *Cel-Tech* court criticized as "too amorphous" the appellate courts' previous attempts to define "unfair" within the meaning of the UCL. (*Cel-Tech, supra,* 20 Cal.4th at p. 185.) The court cited *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164], a case by the state against a convalescent home, in which the court held " '[a]n "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers' " (*Cel-Tech,* at p. 184), and *State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104 [53 Cal.Rptr.2d 229], a consumer case, in which the court held it " ' "must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." ' " (*Cel-Tech,* at p. 184.)

In *Cel-Tech,* the court left open the question of whether its definition of "unfair" should also apply to consumer actions. (*Cel-Tech, supra,* 20 Cal.4th at p. 187, fn. 12.) Following *Cel-Tech,* "appellate court opinions have been divided over whether the definition of 'unfair' under the UCL as stated in *Cel-Tech* should apply to UCL actions brought by consumers." (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1267 [39 Cal.Rptr.3d 634].)

In *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 720, footnote 23 [113 Cal.Rptr.2d 399], the court concluded "we are not to read *Cel-Tech* as suggesting that such a restrictive definition of 'unfair' should be applied in the case of an alleged *consumer* injury." The court applied the test used in *People v. Casa Blanca Convalescent Homes, Inc., supra*, 159 Cal.App.3d 509, 530, set forth above. (*Smith v. State Farm Mutual Automobile Ins. Co.*, at pp. 718-719.)

In *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394 [48 Cal.Rptr.3d 770], the court rejected the *Cel-Tech* test in a consumer action, and adopted the following test based on section 5 of the Federal Trade Commission Act: "(1) [t]he consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided." (*Camacho*, at p. 1403.)

In *Scripps Clinic v. Superior Court* (2003) 108 Cal.App.4th 917, 940 [134 Cal.Rptr.2d 101], this court agreed with *Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [128 Cal.Rptr.2d 389], which concluded: " '*Cel-Tech* . . . may signal a narrower interpretation of the prohibition of unfair acts or practices in all unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the court found to be "too amorphous." Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be "tethered" to specific constitutional, statutory or regulatory provisions.' " (Fn. omitted.)

In *Byars v. SCME Mortgage Bankers, Inc., supra*, 109 Cal.App.4th 1134, 1147, another consumer UCL action, this court, without discussion, cited *Cel-Tech*'s definition of "unfair." (See also *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1166 [93 Cal.Rptr.2d 439] [accepting *Cel-Tech* test in consumer action].)

In *Bardin v. DaimlerChrysler Corp., supra*, 136 Cal.App.4th at page 1274, the court urged the Legislature and the Supreme Court to clarify the definition of "unfair" under the UCL in a consumer action.

2

We are not required to adopt a particular definition of "unfair" here, however, because Wells Fargo's practice is not actionable under any of the

above definitions.[6] For instance, Wells Fargo established that its practice did not threaten competition. To the contrary, lenders nationwide uniformly employ the same practice. The declaration of Marshall Dennis, an expert in mortgage lending, stated, "In the Puentes' case, [Wells Fargo] calculated interest on their loan consistent with Fannie Mae and Freddie Mac guidelines and with the standards that prevail in the secondary mortgage market. [Wells Fargo]'s method of interest calculation for the Puentes' loan *is the same one that has been used by approximately ninety-nine percent of residential mortgage lenders in this country for the past half century or more.*" (Italics added.)

The declaration of Thomas Lambert, a certified public accountant with expertise in consumer financing, stated: "The definitions, formulas and application of those formulas as expressed in . . . Appendix J are generally recognized and consistently applied in the consumer finance industry for residential home mortgages. The basic premise that all months shall be considered equal ensures that consumers can readily compare various credit terms. *After surveying over twenty other Wells Fargo competitors, I found none who use accounting definitions and formulas that deviate from those found in Appendix J to Regulation Z.*" (Italics added.)

Further, the declaration of Jody Leo, an assistant vice-president of Wells Fargo, stated, "I know of no mortgage lender that deviates from the accounting definitions and formulas of Regulation Z when calculating interest on residential mortgage loans."[7]

The Puenteses submitted no evidence disputing Wells Fargo's experts or raising any triable issue of fact as to the effect of its interest calculations on competition.

Additionally, any injury Wells Fargo's practice fortuitously caused some consumers was not substantial. The Puenteses calculated they were charged

---

[6] The Puenteses object to Wells Fargo's reliance on what they call "parol evidence" on the ground the promissory note is unambiguous. The evidence, however, is germane to the issue of whether the alleged breach of contract may form the predicate for a UCL action.

[7] The amicus curiae brief of the California Bankers Association states, "We are aware of no mortgage servicers who process loans sold in the secondary market that calculate monthly interest differently *during the year of payoff from all other months.*" The brief also states that with respect to Wells Fargo's practice, "every California mortgage lender that originates and sells loans stands in the same position." We may consider these assertions even though they are not supported by citations to evidence in the record. "[I]t is not unusual for an amicus curiae brief to include factual material that is outside the record . . . ." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2007) ¶ 9:210.1, p. 9-54.2, citing *Rivera v. Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 590, fn. 20 [71 Cal.Rptr. 739].) In any event, our holding does not depend on any amicus curiae brief.

for approximately 182.5 days of interest rather than the 181 actual days in the full months of their loan. Depending on the month of prepayment, however, Wells Fargo's practice benefited many consumers. For instance, had the Puenteses paid off their loan at the end of January 2003, instead of after February, under the uniform 30.4-day month they would have been charged for 152 days of interest for the full months of the loan rather than the 153 actual days. This also shows Wells Fargo's practice was not immoral, unethical, oppressive or unscrupulous, as the company realized no net monetary benefit by using the uniform month.

The Puenteses' reliance on *Motors, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735 [162 Cal.Rptr. 543], for the proposition that a practice is unfair if it harms some consumers, even if it benefits other consumers, is also unavailing. *Motors* was at the demurrer stage, and the court held the plaintiff stated a prima facie case of unfairness by alleging the defendant's advertising rate structure "forces plaintiff [which was not a retailer, but a company whose products were sold by retailers] and others similarly situated to pay 30 percent more for an advertisement informing the public where certain products can be purchased at retail, than defendant charges to competing retail establishments that sell the same product." (*Id.* at p. 741.) The court explained, however, that ultimately "the determination of whether a particular business practice is unfair necessarily involves an examination of its impact on its alleged victim, *balanced against the reasons, justifications and motives of the alleged wrongdoer.*" (*Id.* at p. 740, italics added.) This case is not at the demurrer stage, but was disposed of on undisputed evidence. *Saunders v. Superior Court, supra,* 27 Cal.App.4th 832, 840–841, on which the Puenteses also rely, is likewise a demurrer case in which the court noted that while the plaintiff stated a prima facie case based on disparate charges to classes of consumers, the issue of unfairness must await resolution at trial.

The Puenteses' reliance on *Orkin Exterminating Co., Inc. v. F.T.C.* (11th Cir. 1988) 849 F.2d 1354 is also misplaced, as there the court found substantial injury based on an exterminating company's receipt of more than $7 million in revenues from contract renewal fees to which it was not entitled. Here, it is undisputed that Wells Fargo's practice did not increase its net revenues. Further, in *Orkin,* the consumer injury was not offset by any countervailing justification for the practice at issue, and here it is.

Wells Fargo produced evidence that any injury to some consumers was offset by countervailing benefits to consumers and competition. According to

Wells Fargo's mortgage expert Dennis, the "mortgage lending industry is supported by a critical secondary market—that is, the mortgage lenders that originate loans typically sell a majority of those loans in this market," and the largest participants in the secondary market are Fannie Mae and Freddie Mac, which the federal government created for the specific purpose of purchasing mortgages.

Dennis explained the "secondary mortgage market benefits consumers by increasing the availability of loan funds and decreasing the costs of loans." "Also, the secondary mortgage reduces interest rates by making available for mortgage lending billions of dollars at a substantially lower cost than would otherwise be possible, and increasing competition among mortgage lenders (which, by selling mortgages into the secondary market, require little actual capital). Specifically, it has commonly been estimated that the vibrancy of the United States secondary mortgage market results in mortgage loans with interest rates that are from one-half to two percent lower than they otherwise would be without the secondary market. Moreover, the additional billions of dollars of available capital ensures that millions of consumers are able to borrow the funds necessary to purchase their homes. Without the secondary market they would be unable to do so."

Further, the Dennis declaration advised that "[t]o allow for the efficient sale and securitization of mortgages—that is, to minimize risk and transaction costs while maximizing investor interest—mortgages must be uniform. Fannie Mae and Freddie Mac have therefore established rules and regulations for the mortgages they buy. Specifically, Fannie Mae and Freddie Mac each have guidelines that lenders and loan services must follow, or Fannie Mae or Freddie Mac will not purchase the loan. [¶] . . . The uniformity created by Fannie Mae and Freddie Mac (which has been adopted by the secondary market generally) includes a form note that is used by lenders nationwide, form documents and disclosures to accompany the note, and guidelines on how the loan servicer must calculate interest based upon the note and related documents." The declaration explained that had the Puenteses' loan not been "made on the Fannie Mae/Freddie Mac form note, and if its interest was not calculated in the manner prescribed by the Fannie Mae and Freddie Mac guidelines, the . . . loan could not have been sold on the secondary market—Fannie Mae and Freddie Mac do not purchase loans that are not made and serviced consistent with their uniform and standard terms and procedures."

The declaration of Wells Fargo's assistant vice-president Leo stated: "Wells Fargo sells substantial numbers of originated conventional loans on the secondary mortgage market. Those loans, in turn, are sold to third parties. By selling conventional loans in the secondary market, Wells Fargo maximizes

the funds it has available to make residential loans and minimizes some of the risks associated with residential mortgage lending. If Wells Fargo was unable to sell its loans on the secondary market it would have to dramatically reduce its lending activities due to a shortage of funds available to loan."

The Leo declaration also explained: "[I]n all of its conventional residential mortgage loans, Wells Fargo uses form contracts provided by Freddie Mac and Fannie Mae. The use of these form documents by Wells Fargo and other lenders maintains continuity across the industry. Requiring Wells Fargo to calculate interest differently from [its current] method . . . would significantly affect Wells Fargo's exercise of its real estate lending powers, including severely altering [its] duties and obligations to the secondary market. . . . It would also be costly and difficult for Wells Fargo to have one interest computation method for California that differs from the rest of the nation and Wells Fargo's competitors."[8]

Again, the Puenteses produced no contradictory evidence.

The consumer benefit of Wells Fargo's adherence to Regulation Z and appendix J in calculating equal monthly payments—and not recalculating interest during the year of payoff to retrospectively make monthly payments unequal—far outweighs the de minimis injury to some consumers who, like the Puenteses, may pay for a day or two of additional interest than if actual days in the month were used.

■ Wells Fargo met its burden of persuasion that its practice is not fraudulent or unfair within the meaning of the UCL, and the Puenteses raised no triable issues of material fact in their opposing papers. Accordingly, summary judgment was proper.[9]

---

[8] According to California Bankers Association's amicus curiae brief, a rule requiring the recalculation of uniform monthly interest payments already made, at the time of prepayment of a mortgage, would cause California lenders to "have limited access to funding from the secondary loan market. As funding decreases, California lenders will make fewer loans. This exerts upward pressure on interest rates and thus defeats the fundamental purposes for developing the secondary market—to make home loans more abundant and more affordable."

Similarly, the amicus curiae brief of the Mortgage Bankers Association states that a "change to the long-established method of calculating interest would disrupt the practice of all mortgage lenders who do business in California, whether based there or not. [¶] Furthermore, the secondary market depends on uniformity. If [the Puenteses'] calculation was adopted, mortgage lenders throughout the nation would be forced to do business one way for California and another way for every other state. This may affect a lender's ability to sell loans on the secondary market, and ultimately may result in lenders refusing to do business in California. As a result, consumers would suffer. Because uniformity allows the secondary market to thrive, consumers benefit from the fact that the market drives down mortgage rates and makes homeownership more affordable for consumers throughout the nation."

[9] Given our holding, we are not required to reach the federal preemption issue.

## DISPOSITION

The judgment is affirmed. Wells Fargo is entitled to costs on appeal.

Nares, J., and Haller, J., concurred.