Filed 11/14/13  Herrera v. Unistar Food Processing CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOSE HERRERA,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>UNISTAR FOOD PROCESSING, INC.,<br><br>    Defendant and Respondent. | B241440<br><br>(Los Angeles County<br>Super. Ct. No. KC060484) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert A. Dukes, Judge.  Affirmed.

Mancini & Associates, Marcus A. Mancini, Timothy J. Gonzales, Michael R. Fostakowsky; Benedon & Serlin, Gerald M. Serlin and Wendy S. Albers for Plaintiff and Appellant.

Koeller, Nebeker, Carlson & Haluck, Gary L. Hoffman and Tracy L. Hughes for Defendant and Respondent.

————————————

# INTRODUCTION

After a serious industrial accident involving a commercial meat grinder, plaintiff Jose Herrera sued his employer, defendant Unistar Food Processing, Inc. (Unistar), pursuant to Labor Code section 4558 (section 4558), the power press exception to the exclusivity provision of the worker's compensation law. Unistar successfully moved for summary judgment on the ground that the meat grinder was not a power press within the meaning of section 4558. Herrera appeals from the judgment. We conclude the trial court properly granted the motion and affirm the judgment.

# FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Accident*

Herrera worked at Unistar's facility in Pomona using a Butcher Boy meat grinder to grind cubes of frozen raw pork. The meat grinder Herrera used consisted of a metal box with a rectangular pan at the top. The pan had a hole that acted as a hopper or a chute into which a Unistar employee fed the meat 10.5 inches down towards a metal screw or worm. The metal screw or worm was housed in a steel tube all the way to where a metal plate was installed. The meat moved past a knife, located 14 inches from the center of the hopper,[1] through a metal plate with multiple holes and was deposited into a plastic bag.

Herrera's job at Unistar was to grind cubes of frozen pork by placing them onto the plate of the meat grinder and then push them into the hopper. Because the cubes of pork were frozen, they would bounce around on the rotating worm screw, and he had to use his hand to feed the worm. Herrera would place his right fist into the vertical hopper and push the frozen meat against the rotating worm housed within the horizontal chute

---

[1]    Herrera referred to this knife as a "spinner," although he did not know the function of the spinner. He believed that the worm ground the meat.

until the worm grabbed onto the meat.[2]  The meat would then travel toward a perforated plate through which the ground meat would "pour out" and fall directly into a plastic bag that Herrera held with his left hand.  When Herrera thought the required amount of meat had fallen into the bag, he would turn off the machine and weigh the bag.  Once the bag had achieved the desired weight, Herrera would tie the bag and put it on a pallet, which Unistar distributed to buyers.  Unistar did not shape the meat or do anything else with it before shipping it.

There never was any type of guard over the opening to the rotating worm during the entire time Herrera used the meat grinder.  Herrera knew of a guard "that was hanging," but he did not know if it was the guard for the meat grinder and he never made any inquiries about it.

On February 4, 2009 Herrera was pushing the cubed pork down the machine's vertical chute using his gloved right fist, as he had been trained.  The accident occurred when his fist became stuck to the frozen pork and the machine drew his right hand and arm into the machine's rotating screw.  At the time of the accident, the meat grinder was not equipped with its protective guard.  As a result of this accident, a portion of Herrera's right arm had to be amputated.

B.      *Herrera Sues Unistar and Unistar Moves for Summary Judgment*

On June 22, 2011 Herrera filed his first amended complaint, alleging a cause of action against Unistar for a violation of section 4558.[3]  Herrera alleged that the meat grinder was a power press within the meaning of section 4558 and that Unistar had failed

---

[2]      On those occasions when the frozen pork stuck to his glove, Herrera often feared that his hand or arm would be pulled into the horizontal chute housing the rotating worm screw.  He did not voice his concerns to anyone, however, because he was just doing what he had been taught to do.

[3]      Herrera also named American Meat Equipment LLC and Unistar Food, Inc. as defendants.  At Herrera's request, the trial court dismissed them from the action with prejudice.

to install or had removed the point of operation guard supplied by the manufacturer of the machine.

Unistar filed a motion for summary judgment. Unistar argued that Herrera could not "establish sufficient facts to invoke the power press exception to the workers' compensation exclusive remedy" set forth in section 4558. Unistar argued that the meat grinder did not include a die that created a mirror image product and that the meat grinder did not produce material used to manufacture another product.

In support of its motion for summary judgment Unistar submitted the declaration of Michael Fourney, a mechanical engineer, along with excerpts of Herrera's deposition testimony. Unistar also submitted pictures of the meat grinder and its various parts, as well as excerpts from the Parts List and Instruction Manual for the Butcher Boy meat grinder.

In his brief declaration Fourney stated as follows:

"l. I am a Registered Professional Mechanical Engineer and have been qualified as an expert on numerous occasions.

"2. On December 15, 2011, I inspected the subject Butcher Boy Meat Grinder Model A56H.P. Serial Number 949 at Unistar Foods Processing Facility in Pomona, California.

"3. As part of my inspection, I took photographs and measurements of the various aspects of the machine.

"4. The meat grinder consists of a metal box with a rectangular pan at the top.

"5. In the rectangular pan is a hole that acts as a hopper or a chute where the meat is fed down towards a metal screw or worm.

"6. The rotating metal screw moves the meat towards a 4-bladed knife.

"7. The meat is then moved past the knife through a metal plate with multiple holes.

"8. The measurement between the bottom of the metal rectangular pan down the hopper to the metal screw is 10.5 inches. . . .

"9. The measurement from the center of the hopper to the 4-bladed knife is 14 inches. . . ."

C.    *Herrera's Opposition*

In opposition to Unistar's motion for summary judgment, Herrera submitted the declaration of Richard Chandler, a mechanical engineer. After inspecting the meat grinder and the operating manual and parts list, Chandler declared as follows: "The subject meat grinder is designed to be manually supplied with solid pieces of meat that have been pre-cut to an approximate size of 2-inch cubes. Further, the operator is to use a tool or 'stomper' through a guard to push the cubed meat into a vertical throat that connects to a horizontal feed screw that is turned by a 7.5 horsepower motor. . . . The feed screw pushes the meat cubes forward toward a perforated plate (or die) with substantial force. . . . The feed screw forces the meat against the internal face of a perforated plate (or die), and at the face of the perforated plate (or die), the meat is cut into finely sized pieces by a rotating four blade knife ('spinner') that is attached to the end of the feed screw. As a result of the pressure or force from the feed screw, the finely sized pieces of meat are then extruded through the perforations in the plate (or die)." Chandler also stated: "At the time of Plaintiff's injury, the subject meat grinder was producing raw ground pork. According to the Internet web site of Unistar Foods, Inc., they are in the business of selling meat to restaurants and markets. The ground meat produced by the subject meat grinder is used by restaurants to produce ground pork based food items for the restaurant patrons. Based on the use of ground meat in restaurants to produce new products that are different than that produced in the subject machine, it is my opinion that the subject machine produces a product that is used in the manufacture of other products."

Chandler further observed that "[t]he solid 2 inch cube pieces of meat that are fed into the subject meat grinder are resized by shredding from the rotating feed screw and by being chopped to a fine size with the rotating knife. When the meat has been resized into finely sized particles, it is an amorphous mass and is without form. The end product from

5

the subject meat grinder is formed when the amorphous mass of finely sized particles are [*sic*] shaped into long individual strands by an extrusion operation. Based upon the extrusion operation imparting the shape to the material, it is my opinion that the subject meat grinder is a machine that forms materials." "The finely sized particles of meat are extruded through the numerous perforations or round holes in a 6 inch diameter by ¾ inch thick steel disk (or die). The extruded stands of material are formed or shaped by the forces (originating from the feed screw) that are pressing the material against the perforated disk (or die) and forcing the material to extrude through the holes in the disk (or die). It is the perforated disk (or die) that determines the shape of the product and not the rotary knife or the feed screw. . . . Based on the above, it is my opinion that the shape is imparted to the material by the pressing the material against the perforated disk (or die), and it is the perforated disk (or die) that determines the shape of the product."

Chandler also explained that "[t]he extrusion of the material through the holes in the perforated disk (or die) results in a product in which the number of strands of material are exactly the same as the number of holes in the disk (or die). In addition, the diameter and/or shape of each of the individual material strands is approximately the same as the diameter and/or shape of the corresponding hole in the perforated disk (or die). Based on the above, it is my opinion that the configuration of the perforated disk (or die) replicates itself in some form in the extruded product." "Because the perforated disk (or die) imparts shape to the material by pressing against the material . . . , and because the configuration of the perforated disk (or die) has been replicated in some form in the product . . . , it is my opinion that the perforated disk is a die. It is my further opinion that in the subject meat grinder the formation of materials is effectuated with a die."

Chandler also opined that Herrera suffered his injury at the point of operation, "where the meat is manually fed into the machine and where the feed screw advances the material or meat." Chandler noted that the guard that had been removed from the machine was the point of operation guard, which the manufacturer of the meat grinder provided or required. Finally, Chandler opined that Unistar's removal of the point of operation guard was a substantial factor in causing Herrera's injuries and that Herrera

6

would not have been injured "[i]f the guard [had] been placed over the vertical throat . . . ."

### D. *Trial Court's Ruling and Judgment*

The trial court granted Unistar's motion for summary judgment. The court found that Unistar met its initial burden of proof, "as there is no evidence that a die is used in any of the parts of the subject meat grinder, nor that the ground meat is used in the manufacture of other products." The court further determined that Herrera "failed to meet his burden in opposition to the motion since the product formed by the meat grinder is not a mirror image of the holes in the metal end plate, so that the metal end plate does not constitute a 'die.'" The court noted that "the holes from the end plate form the meat into an entirely different shape, i.e., cylindrical strands. [Herrera's] definition of 'die' is too broad, rendering the narrow exception in . . . § 4558 meaningless. While the holes in the metal plate do shape material, they do not shape the material into a mirror image of the die. Moreover, [Herrera] has produced no evidence so as to meet its burden in opposition to Unistar's position that the ground meat was not used in the manufacture of other products, as provided by . . . § 4558."

The trial court concluded that the meat grinder was not a power press within the meaning of section 4558, subdivision (a)(4), because "it does not utilize a die which is designed for use in the manufacture of other products." The court therefore determined that worker's compensation was Herrera's exclusive remedy. The trial court entered judgment in favor of Unistar, and Herrera appealed.

## DISCUSSION

### A. *Standard of Review*

Under Code of Civil Procedure section 437c, subdivision (c), a defendant is "'entitled to summary judgment only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a

7

matter of law." [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendant['s] motion. [Citations.] In so doing, we view the evidence in the light most favorable to plaintiff[] as the losing part[y], resolving evidentiary doubts and ambiguities in [his] favor.' [Citation.]" (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 605-606; accord, *Biancalana v. T.D. Service Co.* (2013) 56 Cal.4th 807, 813.) "While appellate review operates under the same general principles applicable in the trial court, the appellate court must independently determine the construction and effect of the facts presented to the trial judge as a matter of law." (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483; see *Kasparian v. AvalonBay Communities, Inc.* (2007) 156 Cal.App.4th 11, 18, 24.) We "'are not bound by the trial court's stated reasons or rationales.'" (*California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 496.)

      B.      *The Power Press Exception to the Worker's Compensation Exclusivity Rule*

"Where an employee is injured in the course and scope of his or her employment, workers' compensation is generally the exclusive remedy of the employee and his or her dependents against the employer. (Lab. Code, §§ 3600, subd. (a), 3602.) The 'exclusivity rule' is based upon a presumed compensation bargain: '[T]he employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.' [Citation.]" (*LeFiell Manufacturing Co. v. Superior Court* (2012) 55 Cal.4th 275, 279, fn. omitted.)

There are a number of statutory exceptions to the exclusivity rule "that authorize the injured worker to seek to augment the workers' compensation benefits by bringing an action at law for damages against the employer." (*LeFiell Manufacturing Co. v. Superior*

*Court*, *supra*, 55 Cal.4th at p. 279.)  One of these exceptions, the power press exception, is set forth in section 4558.  (*Id.* at p. 280; *Rosales v. Depuy Ace Medical Co.* (2000) 22 Cal.4th 279, 281; *Islas v. D & G Manufacturing Co., Inc.* (2004) 120 Cal.App.4th 571, 575.)  This exception must be construed narrowly.  (*LeFiell*, *supra*, at p. 286.)

Subdivision (b) of section 4558 provides:  "An employee . . . may bring an action at law for damages against the employer where the employee's injury or death is proximately caused by the employer's knowing removal of, or knowing failure to install, a point of operation guard on a power press, and this removal or failure to install is specifically authorized by the employer under conditions known by the employer to create a probability of serious injury or death."  There is no liability under section 4558, however, "absent proof that the manufacturer designed, installed, required, or otherwise provided by specification for the attachment of the guards and conveyed knowledge of the same to the employer."  (§ 4558, subd. (c).)  A point of operation guard as used in section 4558 "includes any apparatus or device that keeps a worker's hands outside the point of operation while operating a power press."  (*Bingham v. CTS Corp.* (1991) 231 Cal.App.3d 56, 59.)

"The obvious legislative intent and purpose in section 4558 is to protect workers from employers who willfully remove or fail to install appropriate guards on large power tools.  Many of these power tools are run by large mechanical motors or hydraulically. [Citation.]  These sorts of machines are difficult to stop while they are in their sequence of operation.  Without guards, workers are susceptible to extremely serious injuries.  For this reason, the Legislature passed section 4558, subdivision (b), which subjects employers to legal liability for removing guards from powerful machinery where the manufacturer has designed the machine to have a protective guard while in operation." (*Ceja v. J. R. Wood, Inc.* (1987) 196 Cal.App.3d 1372, 1377; accord, *Aguilera v. Henry Soss & Co.* (1996) 42 Cal.App.4th 1724, 1729.)  Nevertheless, the "Legislature did not intend *all* workers injured by the absence of a point of operation guard to bring a legal action.  Rather, it intended to provide relief only for a specific portion of those employees—workers whose employer knowingly failed to install or removed guards

9

from a machine where the original manufacturer designed the machine to have a protective guard while in operation." (*Jones v. Keppeler* (1991) 228 Cal.App.3d 705, 711.)

C.      *Definition of a Power Press*

Subdivision (a)(4) of section 4558 defines a power press as "any material-forming machine that utilizes a die which is designed for use in the manufacture of other products." "This definition entails four elements. The power press itself is a machine. It is a machine that forms materials. The formation of materials is effectuated with a die. Finally, the materials being formed with the die are being formed in the manufacture of other products." (*Ceja v. J. R. Wood, Inc.*, *supra*, 196 Cal.App.3d at p. 1376.)

The California Supreme Court defined the term "die" in *Rosales v. Depuy Ace Medical Co.*, *supra*, 22 Cal.4th 279. The court stated that "the term 'die' clearly denotes not *all* material-forming tools, but a subset of such tools. The devices described in dictionary definitions of 'die' generally share two pertinent characteristics. First, they impart form to the material by impact or pressure *against* the material, rather than *along* the material. Second, they impart to the material some version of the die's own shape. The two characteristics are logically related, since the die, acting by impact against the material, can only alter the form of the material where it impacts it, necessarily leaving an impression or cutout of its own shape (unlike a linear cutting blade that, moving along the surface of the material, can be directed to cut out any desired shape). The first characteristic (impact or pressure against or through the material) particularly describes dies used in *presses* and hence limits the term as used in section 4558, subdivision (a)(4); but, because the first characteristic necessarily implies the second, [it is proper to] treat[] the second characteristic as a test of whether a tool is a die within the meaning of section 4558, subdivision (a)(4)." (*Id*. at p. 285.) The court then defined "die" as "a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding" as opposed "to a tool that imparts shape by cutting *along* the material in the manner of a blade." (*Ibid*.; see 2 Eskenazi et al., Cal. Civil

10

Practice: Workers' Compensation (2007) Tort Actions Against Employers, Insurers, and Other Employees, ch. 15, § 15:14, p. 15-21 [a die "does not refer to a tool that imparts shape by cutting along the material in the manner of a blade"].)

The *Rosales* court further noted that "[i]t may be that one or more types of dies referred to in the quoted dictionary definitions are exceptions to the above general principles in that they act to shape material by means other than by pressing or impacting against or through the material.  Assuming that to be so, however, we nonetheless do not believe the Legislature intended the term 'die' in section 4558, subdivision (a)(4)—a die used in a power press—to be understood more broadly than as a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding.  Indeed . . . the Legislature presumably believed the operation of power *presses* without point of operation guards to be particularly dangerous, because a press typically forms or cuts the material by use of high pressure or strong impact of the die against or through the material, using a 'powerful pressing or stamping motion which can cause serious crush injuries.'  [Citation.]  In defining a 'power press,' for purposes of section 4558, in terms of a 'die,' the Legislature patently intended to embody the characteristic that differentiates 'press[es]' from other 'material-forming machine[s],' i.e., the use of a tool that imparts shape to material by pressing or impacting against or through the material, that is, by punching, stamping or extruding." (*Rosales v. Depuy Ace Medical Co.*, *supra*, 22 Cal.4th at pp. 285-286.)

Applying these definitions, the *Rosales* court held that a power lathe used to manufacture aluminum knobs was not a power press within the meaning of section 4558 because the V-notching tool used to shape the aluminum into a knob by cutting the material along its surface, and which injured the plaintiff, was not a die.  (*Rosales v. Depuy Ace Medical Co.*, *supra*, 22 Cal.4th at p. 285; see *Graham v. Hopkins* (1993) 13 Cal.App.4th 1483, 1487-1489 [wood molding machine that did not utilize a die was not a power press]; *Ceja v. J. R. Wood, Inc.*, *supra*, 196 Cal.App.3d at p. 1377 [small handheld circular saw is not a power press under section 4558 because its blade is not a die].)

11

D.     *The Power Press Exception Does Not Apply Here*

In moving for summary judgment, Unistar had the initial burden of showing that Herrera could not establish one or more elements of his section 4558 cause of action or that Unistar had a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Smith v. St. Jude Medical, Inc.* (2013) 217 Cal.App.4th 313, 320; *American Way Cellular, Inc. v. Travelers Property Casualty Co. of America* (2013) 216 Cal.App.4th 1040, 1050.)  The trial court concluded that Unistar met this burden, and on appeal Herrera does not challenge this conclusion. (See *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 ["[o]n review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court"].)  Rather, Herrera contends that he met his burden of producing evidence demonstrating there was a triable issue of material fact regarding whether the meat grinder contained a die and that the trial court erred in finding as a matter of law that the meat grinder was not a power press because "the ground meat was not used in the manufacture of other products."

Chandler characterized the metal perforated plate in the meat grinder as a die and painstakingly described the inner workings of the meat grinder.  He explained that the rotating worm screw shredded the cubes of frozen pork and forcefully pressed the meat against the internal face of the metal plate and forced the meat into the perforations.  A spinning cross blade then cut the meat.  The continuous pressure provided by the worm screw caused the cut particles of pork to be extruded through the holes in the plate as strands of ground pork.  Chandler explained that the perforated disk, rather than the rotary knife or the worm screw, determined the shape of the product, and that the number of strands extruded matched the number and size of the holes in the plate.  He further opined that because the perforated disk "imparts shape to the material by pressing against the material" and because "the configuration of the perforated disk (or die) has been replicated in some form in the product," "the perforated disk is a die" and that "in the . . . meat grinder the formation of materials is effectuated with a die."

Assuming without deciding that Chandler's declaration was sufficient to create a triable issue of fact regarding whether the meat grinder contained a die that imparted

12

shape to material by using an extrusion process (see *Rosales v. Depuy Ace Medical Co.*, *supra*, 22 Cal.4th at p. 285),[4] we conclude that Unistar was still entitled to summary judgment. As noted above, section 4558, subdivision (a)(4), defines a power press as "any material-forming machine that utilizes a *die which is designed for use in the manufacture of other products*." (Emphasis added.) Under this unambiguous statutory language, which we give "'a plain and commonsense meaning'" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165), in order for a material-forming machine to qualify as a power press under section 4558, the die in the machine must be used to manufacture another product.[5] The meat grinder here does not manufacture another product. What goes into the meat grinder comes out of the grinder, albeit in smaller pieces. Cubed pork goes in, and ground pork comes out. Thus, a meat grinder does not manufacture a different product. It merely minces the meat.

Although the question of whether a particular machine is a power press within the meaning of section 4558 typically is a question of fact for the jury (*Islas v. D & G*

---

[4]    The word "extrude" means "to thrust out; force or press out; expel; . . . to form (metal, plastic, etc.) with a desired cross section by forcing it through a die." (Webster's Encyclopedic Unabridged Dict. (Deluxe ed. 2001) p. 687, col. 1; see *Power Curbers, Inc. v. E. D. Etnyre & Co.* (4th Cir. 1962) 298 F.2d 484, 486, fn. 2 [parties' experts "defined extrusion as forcing material under pressure through an opening or die"]; *Troxler Electronic Laboratories, Inc. v. Pine Instrument Co.* (E.D.N.C. 2009) 597 F.Supp.2d 574, 591 [parties stipulated that "the term 'extrude' is defined as 'to force, push or thrust a material out or through a structure'"]; *Sigma-Tau Industrie Farmaceutiche Riunite, S.P.A. v. Lonza, Ltd.* (D.D.C. 1999) 62 F.Supp.2d 70, 86, fn. 20 ["'[e]xtrude' is defined as 'to push or thrust out; to shape (e.g., metal or plastic) by forcing through a die'"].)

[5]    We disagree with Unistar and the trial court that section 4558 applies only when the product produced by the machine is used to manufacture another separate product. The statute only requires that the product produced by the machine is made with a die. To the extent that the court's statement in *McCoy v. Zahniser Graphics, Inc.* (1995) 39 Cal.App.4th 107, 111, cited by Unistar, that a "sheet metal plate [of a printing press] is not a die because it is not used to cut or form material to be used in the manufacture of other products" suggests that the material produced by the die must in turn be used to manufacture another product, the statement is inconsistent with the language of the statute.

*Manufacturing Co., Inc.*, *supra*, 120 Cal.App.4th at p. 580), in an appropriate case the court can resolve the question as a matter of law on summary judgment. (See *Rosales v. Depuy Ace Medical Co.*, *supra*, 22 Cal.4th at pp. 285, 286 [V-notching tool which cuts material rotating on a lathe is not a die; lathe using a sharp-edge cutting tool is not a power press]; *McCoy v. Zahniser Graphics, Inc.*, *supra*, 39 Cal.App.4th at p. 111 [sheet metal plate used in printing process is not a die within the meaning of section 4558; printing press is not a power press].) This is such a case. (See *Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 642-643 [where "'the material facts are not in dispute and the parties simply dispute the legal significance of the facts, the matter may be resolved on summary judgment as a matter of law'"].) Therefore, the trial court properly granted Unistar's motion for summary judgment.[6]

## DISPOSITION

The judgment is affirmed. Unistar is to recover its costs on appeal.


SEGAL, J.[*]


We concur:


WOODS, Acting P. J.              ZELON, J.

---

[6]     We do not reach the issue of whether section 4558 applies only if the actual die causes the employee's injury.

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.