Filed 11/1/18

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| AMN HEALTHCARE, INC.,<br><br>    Plaintiff, Cross-defendant, and Appellant,<br><br>    v.<br><br>AYA HEALTHCARE SERVICES, INC. et al.,<br><br>    Defendants, Cross-complainants, and Respondents. | D071924<br><br><br><br>(Super. Ct. No. 37-2015-00033229-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge. Affirmed.

DLA Piper and Stanley J. Panikowski, for Plaintiff, Cross-defendant, and Appellant.

Solomon Ward Seidenwurm & Smith, William V. Whelan, Mei-Yin M. Imanaka and Deborah A. Yates, for Defendants, Cross-complainants, and Respondents.

Plaintiff AMN Healthcare, Inc. (AMN) appeals (1) the judgment in favor of defendants Kylie Stein, Robin Wallace, Katherine Hernandez, Alexis Ogilvie (sometimes collectively, individual defendants) and Aya Healthcare, Inc. (Aya) (sometimes

individual defendants and Aya are collectively referred to as defendants); (2) the injunction preventing AMN from enforcing its nonsolicitation of employee provision against individual defendants and its other former employees; and (3) the award of attorney fees in favor of defendants.

AMN and Aya are competitors in the business of providing on a temporary basis healthcare professionals, in particular "travel nurses," to medical care facilities throughout the country. Individual defendants were former "travel nurse recruiters" of AMN who, for different reasons and at different times, left AMN and joined Aya, where they also worked as travel nurse recruiters.

As a condition of employment with AMN, individual defendants each signed a Confidentiality and Non-Disclosure Agreement (CNDA), which, as discussed *post*, included a provision preventing individual defendants from soliciting any employee of AMN to leave the service of AMN for at least a one-year period.[1] Significant in the instant case, a travel nurse was deemed to be an employee of AMN while on temporary assignment through AMN.

AMN sued defendants, asserting various causes of action including breach of contract and misappropriation of confidential information, including trade secrets as set forth in the Uniform Trade Secrets Act, Civil Code sections 3426 *et seq*. (UTSA). Defendants filed a cross-complaint for declaratory relief and unfair business competition.

---

[1] Some versions of AMN's CNDA required former employees to refrain from soliciting AMN employees (i.e., travel nurses) for a period of 18 months, rather than one year.

Defendants moved for summary judgment of AMN's operative complaint and of their own cross-complaint. Defendants claimed that the nonsolicitation of employee provision in the CNDA was an improper restraint on individual defendants' ability to engage in their profession, in violation of Business and Professions Code[2] section 16600; that as such, AMN's contract-based causes of action failed as a matter of law; and that AMN's tort-based causes of action also failed as a matter of law because the information allegedly used by defendants to recruit travel nurses was not protected.

The trial court agreed with defendants, granted summary judgment against AMN, and granted summary adjudication of defendants' declaratory relief cause of action in their cross-complaint. After granting such relief, the court subsequently enjoined AMN from enforcing the nonsolicitation of employee provision in the CNDA as to any former (California) AMN employee and awarded defendants attorney fees.

As we explain, we independently conclude the court properly granted summary judgment of AMN's operative complaint and of defendants' declaratory relief cause of action in their cross-complaint. We further conclude the court properly exercised its discretion when it enjoined AMN from attempting to enforce its nonsolicitation of employee provision with respect to its former employees, including individual defendants, and when it awarded defendants their reasonable attorney fees.

---

[2]     All further statutory references are to the Business and Professions Code unless otherwise noted.

FACTUAL AND PROCEDURAL OVERVIEW

*Operative Complaint*

In its first amended complaint (FAC), AMN alleged that it provided "staffing services," including through its "Travel Nurse Staffing department," which recruited "traveling nurses ('Travelers') and place[d] them as [AMN] employees, on thirteen-week assignments with hospitals and other healthcare organizations throughout the United States" (¶ 16); and that, in addition to placing travel nurses on new assignments, AMN also extended assignments for its nurses for additional 13-week periods. (*Ibid.*)

Between October 2012 and May 2014, AMN hired individual defendants to work in its travel nurse staffing department to recruit and place travel nurses. (¶ 17.) AMN alleged that individual defendants received AMN's "trade secrets, intellectual property, and confidential and proprietary information, which the Individual Defendants used in performing their job duties." (¶ 18.)

As a condition of employment, individual defendants each signed the CNDA, which were attached as exhibits to the FAC. (¶ 19.) Section 1.2 of the CNDA defined "confidential information" as follows: "Employee acknowledges and agrees that (i) the Company and the Company Affiliates have spent considerable time, effort and money to develop and implement their respective customer lists, financial information, business methods, contracts and contractual relations with the Company's (or the Company Affiliates, as applicable) current or prospective customers, healthcare professionals and prospective healthcare professionals['] names and information, leads and account information, mailing lists, computer programs, advertising campaigns (including, without

4

limitation, displays, drawings, memoranda, designs, styles or devices), marketing, promotional and pricing information, employee names, compensation and benefit information, business prospects, pricing methods, pricing concepts, internal business procedures and business plans, including analytical methods and procedures, financial information, service and operation manuals, documentation, ideas for new products and services, customer and marketing information materials, marketing and development plans, forecasts and forecast assumptions, future plans and potential strategies of the Company or the Company Affiliates, financial data, including price and cost objectives, quoting policies and procedures (collectively, 'Confidential Information') and that these are *confidential trade secrets* and constitute valuable and unique assets of the Company and the Company Affiliates, (ii) during the course of Employee's employment with the Company, Employee has had and will continue to have access to the Confidential Information of the Company or the Company Affiliates or both, and (iii) prior to the commencement of Employee's employment, the Company and the Company Affiliates have established valuable business relationships and substantial goodwill with their customers based on, among other things, their use of their Confidential Information.  The Confidential Information excludes only information that has been made public through no fault of Employee or any of Employee's representatives."  (Italics added.)

Section 2 of the CNDA set forth the obligations of AMN employees not to disclose AMN's "confidential information" both during and after employment with AMN: "In order to protect the Confidential Information of the Company and the Company Affiliates and to promote and ensure the continuity of the relationships of the Company

5

and the Company Affiliates with their customers, healthcare professionals, agents, brokers, Employee covenants and agrees that Employee will not at any time while Employee is employed by the Company in any capacity (whether pursuant to this Agreement or otherwise), or at any time subsequent to Employee's employment with the Company, (i) divulge, publish, disclose, or communicate, in any fashion, form or manner, either directly or indirectly, Confidential Information of the Company or any Company Affiliate to any person, firm, corporation, partnership, association or other entity, or (ii) otherwise directly or indirectly use any Confidential Information for Employee's own benefit or to the detriment of the Company or any Company Affiliate, except that none of the provisions set forth in this Section 2 shall apply to disclosures made to other employees or to officers or directors of the Company or any Company Affiliate, which are made for valid business purposes, at the direction and with the permission of the Company, in connection with the performance by Employee of Employee's duties and responsibilities hereunder."

As noted, the CNDA also included a nonsolicitation of employee provision, section 3.2. It provided: "Employee covenants and agrees that during Employee's employment with the Company and for a period of [one year or] eighteen months after the termination of the employment relationship with the Company, Employee shall not directly or indirectly solicit or induce, or cause others to solicit or induce, any employee of the Company or any Company Affiliate to leave the service of the Company or such Company Affiliate." (¶ 22.) Because AMN's travel nurses were employees of AMN, the FAC alleged section 3.2 applied to prevent for a period of at least one year a former

6

AMN employee from recruiting a travel nurse who was on temporary assignment for AMN. (*Ibid.*)

On or about June 22, 2015, defendant Stein resigned from her employment with AMN and accepted a position with Aya. The FAC alleged that while an AMN employee, Stein had been working to extend the assignments of two AMN travel nurses, Brandon Morris and Jamie Meyer; that at or near her resignation with AMN, "Stein solicited or induced Morris and Meyer to leave" AMN's employment and become employees of Aya; that in order to do so, Stein used "confidential and proprietary information" regarding the identities of these two individuals, including the terms and conditions of their employment with AMN (¶ 24); and that Morris and Meyer accepted employment with Aya, which extended their existing assignments, in July and August 2015, respectively. (¶ 25.)

On September 9, 2015, Wallace resigned from AMN and began working for Aya. The FAC alleged that before she resigned, Wallace accessed without AMN's approval "a confidential and proprietary document containing information regarding the Travelers that Wallace had placed on assignment through [AMN]." (¶ 26.) Wallace then e-mailed this document to her personal e-mail address for use after her resignation with AMN. The FAC further alleged that Wallace on the same day forwarded to an Aya recruiter a confidential and proprietary e-mail sent by AMN senior manager Theresa Wilhelm. The Wilhelm e-mail "contained information regarding Aya," including outlining a strategy for "competing with Aya." (¶ 27.) AMN alleged both documents forwarded by Wallace

7

contained confidential information as defined in section 1.2 of the CNDA, including trade secrets. (¶ 28.)

On or about June 25, 2015, Hernandez resigned from AMN and joined Aya. Before her resignation, Hernandez worked with AMN travel nurse Kym Shay. While employed by Aya, the FAC alleged Hernandez "offered to perform recruiting services for Shay and thereby solicited or induced Shay to leave [AMN's] employment and become an employee of Aya." (¶ 29.)

The FAC alleged that Ogilvie resigned from AMN on or about November 2015 and joined Aya; that during her employment with AMN, Ogilvie had worked with travel nurse Sarah Hennis; and that while employed by Aya, Ogilvie recruited Hennis to leave AMN and join Aya. (¶ 30.)

Plaintiff's FAC asserted 11 causes of action, seeking general and punitive damages and injunctive relief. The first cause of action for breach of contract against individual defendants alleged Stein, Hernandez, and Ogilvie breached the CNDA by soliciting AMN travel nurses to leave AMN and become employees of Aya. It further alleged Wallace breached the CNDA by "divulging, publishing, disclosing, or communicating" AMN's confidential information "other than [AMN's] trade secrets," by using such information to her benefit and to AMN's detriment. (¶¶ 37 & 38.)

AMN's second cause of action for misappropriation of trade secrets, against Stein, Wallace, and Aya, alleged Stein misappropriated AMN's trade secrets — the identity of AMN travel nurses and the terms and conditions of their employment with AMN — by *inter alia* soliciting Morris and Meyer to leave AMN and join Aya (¶ 45); that Wallace

8

misappropriated a document containing AMN trade secrets regarding AMN travel nurses she had placed on assignment while an AMN employee; and that Wallace and Aya misappropriated the Wilhelm e-mail containing trade secrets of AMN outlining a strategy to compete with Aya. (¶ 45.)

AMN's third cause of action against Wallace only alleged that she owed AMN a tort-based duty of loyalty as a result of her execution of the CNDA and her employment with AMN, and that she breached that duty by misappropriating AMN's "confidential and proprietary information — other than [AMN's] trade secrets — for the purpose of accessing and using such information to compete with [AMN]." (¶ 51.)

AMN's fourth and fifth causes of action for intentional and negligent interference with prospective economic advantage, respectively, alleged that defendants knew, or should have known, of AMN's relationships with its travel nurses (¶¶ 56 & 62); that defendants engaged in conduct with the intent to disrupt, or failed to act with reasonable care to avoid disrupting, such relationships by using AMN's "confidential and proprietary information[] other than [AMN's] trade secrets" (¶¶, 57 & 63); and that defendants' conduct was a substantial factor in disrupting such relationships. (¶¶ 58-59 & 65.)

AMN's sixth, seventh, eighth, ninth, and tenth causes of action, against Aya only, respectively alleged Aya intentionally interfered with AMN's contractual relationships with individual defendants; conspired with Wallace to misappropriate AMN's trade secrets; conspired with Wallace to breach her duty of loyalty to AMN; aided and abetted Wallace in the misappropriation of AMN trade secrets; and aided and abetted Wallace in breaching her duty of loyalty to AMN. (¶¶ 66–86.)

9

Plaintiff's eleventh cause of action against defendants alleged that the acts of Wallace in breaching her duty of loyalty to AMN, and of defendants in interfering with AMN's business relationships with its travel nurses, constituted unlawful and unfair business practices within the meaning of section 17200 *et seq.* (UCL). (¶ 88.)

*Summary Judgment/Adjudication*

In support of summary judgment, defendants argued section 3.2 of the CNDA was an unenforceable restraint on trade under section 16600 and thus void. As such, defendants argued AMN's first cause of action for breach of contract failed as a matter of law.

Defendants also argued that AMN's third, fourth, fifth, sixth, eighth, and tenth causes of action failed as a matter of law because there were no underlying, independent wrongful acts accompanying these alleged interference-based causes of action, which generally alleged "tortious interference, breaches of a 'duty of loyalty' by Ms. Wallace, and a generic unfair competition claim." Defendants further argued that there was no liability merely because Aya extended job offers to individual defendants who were all at-will employees of AMN; that individual defendants in turn had the right to recruit, and Aya to hire, travel nurses who had formerly worked for AMN and/or were on assignment, albeit temporarily, with AMN; and that AMN's theory that defendants engaged in wrongful conduct in their recruiting efforts by "using or relying on [']confidential information['] 'other than' AMN's trade secrets" failed as a matter of law because the use of such information was legally permitted in California so long as the information was not a protected trade secret.

10

Finally, regarding the second cause of action for misappropriation of a trade secret, and the seventh and ninth causes of action for conspiring and aiding and abetting such misappropriation, respectively, defendants argued that the information allegedly at issue was not a trade secret because such information was not private; and that, in any event, there was no evidence to show any such information had been misappropriated or used by defendants.

*Opposition to Summary Judgment/Adjudication*

AMN argued the nonsolicitation of employee provision in its CNDA was valid and enforceable as it merely prohibited individual defendants from soliciting "current [AMN] employees," namely, travel nurses on temporary assignment with AMN. It also argued at a minimum triable issues of material fact existed regarding whether defendants misappropriated AMN's trade secrets.

AMN argued that because it functioned as an "employment agency," the "names, addresses, and identities of its Travelers . . . [were] trade secrets *per se* by statute," citing to section 16607. AMN also argued the identities, terms, and conditions of employment, assignment histories, and preferences of its travel nurses were trade secrets, even if defendants "may have had access to some of [this] information at issue through independent means." Finally, AMN argued there were triable issues of material fact regarding whether defendants interfered with AMN's prospective and existing contractual relationships and breached their duty of loyalty.

11

*Court's Ruling*

After ruling on various objections to the evidence made by the parties, hearing oral argument, and revisiting the evidence, as noted the court granted summary judgment against AMN and summary adjudication in favor of defendants on their declaratory relief cause of action in their cross-complaint. The court ruled the nonsolicitation of employee provision was an unlawful restraint on trade in violation of section 16600 because it prevented individual defendants from engaging in their lawful trade or profession — soliciting and recruiting travel nurses on temporary assignment with AMN — for at least one-year posttermination. The court also ruled the use of non-trade secret information by a former employee was protected under section 16600.

Finally, the court found no evidence of misappropriation, noting "[w]hen the court digs into the weeds as to each individual defendant, the evidence does not show that the defendants misappropriated trade secrets. After taking the matter under submission, the Court reviewed the evidence with respect to Wallace allegedly forwarding to Meghan Murphy, a recruiting manager for Aya, an email from Theresa [Wilhelm]. The Court has sustained an objection based on foundation . . . . But even if admissible, the email does not establish a trade secret."[3]

---

[3]    AMN notes in its opening brief that, although the court sustained an objection to the Wilhelm e-mail based on lack of foundation, the e-mail already was in the record as an Aya exhibit and was discussed in declarations of multiple Aya witnesses.

DISCUSSION

I

<u>Summary Judgment Was Properly Granted</u>

A. *Summary Judgment Standard*

"Summary judgment and summary adjudication provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citations.] A defendant moving for summary judgment or summary adjudication may demonstrate that the plaintiff's cause of action has no merit by showing that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action." (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 587 (*Collin*).)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact . . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element X." (*Id.* at p. 853.)

"After the defendant meets its threshold burden [to demonstrate that a cause of action has no merit], the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense. [Citations.] The plaintiff may not simply rely on the allegations of its pleadings but, instead, must set forth the specific facts showing the existence of a triable issue of

13

material fact. [Citation.] A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof." (*Collin*, *supra*, 228 Cal.App.4th at p. 588.)

"On appeal, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling [regarding summary judgment], applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." ' " (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658.) Our task is to determine whether a triable issue of material fact exists. (*Collin*, *supra*, 228 Cal.App.4th at p. 588.) In independently examining the record on appeal "to determine whether triable issues of material fact exist" (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530), we " 'consider[ ] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*Ibid.*) A trial court's stated reasons for granting summary judgment are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale. [Citation.]" (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 498 (*Ramalingam*).)

B. *The Nonsolicitation of Employee Provision is Void*

1. Guiding Principles

" '[A]t common law and in many states, a restraint on the practice of a trade or occupation, even as applied to a former employee, is valid if reasonable[.]' (*Bosley*

14

*Medical Group v. Abramson* (1984) 161 Cal.App.3d 284, 288 [(*Bosley*)].)  However,

California long ago rejected the so-called 'rule of reasonableness' when it enacted Civil

Code former sections 1673 through 1675, the predecessor sections to Business and

Professions Code sections 16600 through 16602.  'At least since 1872, a noncompetition

agreement has been void unless specifically authorized by sections 16601 or 16602.'

(*Bosley*, at p. 288.)  These legislative enactments 'settled public policy in favor of open

competition, and rejected the common law "rule of reasonableness," [and] [t]oday in

California, covenants not to compete are void, subject to several exceptions. . . .'

(*Edwards* [*v. Arthur Andersen LLP* (2008)] 44 Cal.4th [937,] 945 [(*Edwards*)].)"  (*The

Retirement Group v. Galante* (2009) 176 Cal.App.4th 1226, 1233–1234 (*Galante*).)

Section 16600 provides, "Except as provided in this chapter, every contract by

which anyone is restrained from engaging in a lawful profession, trade, or business *of any

kind* is to that extent void."  (Italics added.)  This absolute bar on contractual restrictions

repudiated the earlier, common law rule that allowed reasonable "restraints on the

practice of a profession, business, or trade."  (*Edwards*, *supra*, 44 Cal.4th at p. 945;

*Galante*, *supra*, 176 Cal.App.4th at pp. 1235–1236.)  Thus, unless a contractual restraint

falls into one of section 16600's three statutory exceptions (§§ 16601 [sale of goodwill or

interest in a business], 16602 [dissolution of a partnership], or 16602.5 [dissolution or

sale of limited liability company]), it ostensibly is void.  (*Dowell v. Biosense Webster,

Inc.* (2009) 179 Cal.App.4th 564, 578 (*Dowell*) [noting how California does not follow

the Ninth Circuit's exception for "narrow-restraint[s]" on practicing a profession].)

15

"Section 16600 expresses California's strong public policy of protecting the right of its citizens to pursue any lawful employment and enterprise of their choice.  (*Advanced Bionics Corp. v. Medtronic, Inc.* (2002) 29 Cal.4th 697, 706; *Weber, Lipshie & Co. v. Christian* (1997) 52 Cal.App.4th 645, 659 ['section 16600 was adopted for a public reason'].)  California courts 'have consistently affirmed that section 16600 evinces a settled legislative policy in favor of open competition and employee mobility.' (*Edwards*[, *supra*,] 44 Cal.4th [at p.] 946 . . . .)  'The interests of the employee in his [or her] own mobility and betterment are deemed paramount to the competitive business interests of the employers, where neither the employee nor his [or her] new employer has committed any illegal act accompanying the employment change.'  (*Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 255; *D'Sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, 933 (*D'Sa*).)"  (*Dowell*, *supra*, 179 Cal.App.4th at p. 575.)

 2. <u>Analysis</u>

 Turning to the instant case, we independently conclude that the nonsolicitation of employee provision in the CNDA is void under section 16600.  Indeed, the broadly worded provision prevents individual defendants, for a period of at least one year after termination of employment with AMN, from either "directly or indirectly" soliciting or recruiting, or causing others to solicit or induce, any employee of AMN.  This provision clearly restrained individual defendants from practicing with Aya their chosen profession — recruiting travel nurses on 13-week assignments with AMN.  (See *Dowell*, *supra*, 179 Cal.App.4th at p. 575 [finding a broadly worded nonsolicitation clause preventing employees from rendering any service to "any of the accounts, customers or clients with

16

whom they had contact during their last 12 months of employment" void under section 16600]; *D'Sa*, *supra*, 85 Cal.App.4th at p. 930 [finding a provision in an employee confidentiality agreement was void under section 16600 because it prevented an employee from rendering " 'services, directly or indirectly, for a period of one year after separation of employment with [employer] to any person or entity in connection with any [c]ompeting [p]roduct' "]; *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 (*Metro Traffic*) [finding a broadly worded noncompetition provision void under section 16600 because it prevented an employee from working for a competitor for a period of one year after termination from the employer].)

Indeed, the undisputed evidence in the record shows that, if a former AMN recruiter (i.e., individual defendants) was barred for at least one year from "soliciting or recruiting any travel nurse listed in AMN's database, that would [likewise] restrict the number of nurses with whom a recruiter could work with while employed by his or her new staffing agency"; that if a former AMN recruiter was barred from "soliciting or inducing to leave AMN's employment any AMN current travel nurse with whom he or she had worked with as an AMN recruiter, that would [likewise] restrict the number of nurses with whom a recruiter could work with while employed by his or her new staffing agency"; and that "[n]ot being permitted to contact travel nurses who currently work for AMN could limit the amount of compensation a recruiter would receive with his or her new agency after leaving AMN."

In addition, the undisputed evidence shows travel nurses typically were assigned by AMN for 13-week periods. Although such assignments were sometimes extended, the

17

point is the assignments were *temporary*.[4]  As such, a one-year, posttermination restriction preventing a former AMN recruiter from contacting and recruiting a travel nurse on a 13-week assignment with AMN at a minimum[5] equates to a period of *four* such assignments for a given nurse.  The undisputed evidence thus shows section 3.2 of the CNDA restricted individual defendants' ability to engage in their "profession, trade, or business."

AMN contends section 3.2 is valid because it merely applies to prevent nonsoliciation of its employees (i.e., travel nurses).  To support its contention, AMN primarily relies on *Loral Corp. v. Moyes* (1985) 174 Cal.App.3d, 268 (*Moyes*).  The issue in *Moyes* involved the validity of an agreement that restrained a former executive officer of the plaintiffs from " 'raiding' " the plaintiffs' employees.  (*Id.* at p. 271.)  The plaintiffs sued the defendant in *Moyes* for breach of contract after the defendant became the president of a competitor of the plaintiffs and offered employment to two "key" executive officers of the plaintiffs.  On appeal from a judgment of nonsuit granted after the plaintiffs' opening statement, the *Moyes* court reversed and allowed the case to proceed. In so doing, the court noted that "contracts precluding a former employee from obtaining new employment with a competitor are invalid under section 16600" (*id.* at pp. 275–276),

---

4      As discussed *post*, there is a public group on social media called "The Gypsy Nurse Group" that is comprised of over 30,000 travel nurses.  As the name "gypsy" implies, travel nurses tend to move often as a result of their being on temporary assignment.

5      As noted in footnote 1, *ante*, some of the AMN recruiters signed a nonsolicitation of employee provision that was for a period of 18 months after termination.

18

but nonetheless relied on a reasonableness standard when it found "limited restrictions which tend more to promote than restrain trade and business do not violate the statute. [Citations.]" (*Id.* at p. 276.)

The *Moyes* court ultimately determined that the provision there at issue was more like a nonsolicitation or nondisclosure agreement than an invalid agreement not to compete: "[The d]efendant is restrained from disrupting, damaging, impairing or interfering with his former employer by raiding [the plaintiffs'] employees under his termination agreement. This does not appear to be any more of a significant restraint on his engaging in his profession, trade or business than a restraint on solicitation of customers or on disclosure of confidential information." (*Moyes*, *supra*, 174 Cal.App.3d at p. 279.) The court then noted this "restriction only slightly affects [the plaintiffs'] employees. They are not hampered from seeking employment with [the defendant's new employer] nor from contacting [the defendant]. All they lose is the option of being contacted by him first. It does not restrain them from being employed by [the defendant's employer], contrary to defendant's argument." (*Ibid.*)

*Moyes* was decided several years before *Edwards*. As AMN notes, however, *Edwards* did not address the provision of the noncompetition agreement prohibiting the plaintiff from recruiting employees of the defendant employer, as the plaintiff in *Edwards* had not challenged that particular portion of the noncompetition agreement there at issue. (*Edwards*, *supra*, 44 Cal.4th at p. 946, fn. 4.) AMN thus argues *Edwards's* conclusion that, under the plain meaning of section 16600, an employer "cannot by contract restrain a former employee from engaging in his or her profession, trade, or business[,] unless the

19

agreement falls within one of the exceptions to the rule" (*Edwards*, at pp. 946–947), does not apply to section 3.2 at issue in this case.  We disagree.

We note *Edwards* rejected the employer's argument that the Legislature meant the word " 'restrain' " in section 16600 to mean " 'prohibit,' " such that a "mere limitation on an employee's ability to practice his or her vocation would be permissible under section 16600, as long as it was *reasonably* based."  (*Edwards*, *supra*, 44 Cal.4th at p. 947, italics added.)  *Moyes* use of a reasonableness standard in analyzing the nonsolicitation clause there at issue thus appears to conflict with *Edwards's* interpretation of section 16600, which, under the plain language of the statute, prevents a former employer from restraining a former employee from engaging in his or her " 'lawful profession, trade, or business *of any kind*,' " absent statutory exceptions not applicable here.  (*Edwards*, at p. 945, italics added.)

Our conclusion is further buttressed by the *Edwards* court's refusal to adopt the "limited or 'narrow-restraint' exception to section 16600" created by the Ninth Circuit in *Campbell v. Trustees of Leland Stanford Jr. Univ.* (9th Cir. 1987) 817 F.2d 499 (*Campbell*), which "excepted application of section 16600 ' "where one is barred from pursuing only a small or limited part of the business, trade or profession." ' "  (*Edwards, supra*, 44 Cal.4th at p. 948.)  The *Edwards* court found that "California courts have not embraced the Ninth Circuit's narrow-restraint exception" (*Id.* at p. 949); that "no reported California state court decision has endorsed the Ninth Circuit's reasoning" (*ibid*); and that it was "of the view that California courts 'have been clear in their expression that section

16600 represents a strong public policy of the state which should not be diluted by judicial fiat.' [Citation.]" (*Ibid.*)

Because the *Edwards* court found section 16600 "unambiguous" (*Edwards*, *supra*, 44 Cal.4th at p. 950), it noted that "if the Legislature intended the statute to apply only to restraints that were unreasonable or overbroad, it could have included language to that effect" (*ibid*); and that it was up to the "Legislature, if it chooses, either to relax the statutory restrictions or adopt additional exceptions to the prohibition-against-restraint rule under section 16600." (*Ibid.*)

We thus doubt the continuing viability of *Moyes* post-*Edwards*. But our decision in the instant case does not rest on that analysis alone. Even if *Moyes's* use of a reasonableness standard survived *Edwards*, we find *Moyes* factually distinguishable to our case. Unlike the former employee in *Moyes,* who was an executive officer of the plaintiff employer, in the instant case individual defendants were in the *business* of recruiting and placing on a temporary basis medical professionals, primarily nurses, in medical facilities throughout the country. If enforced, section 3.2 thus restrained individual defendants from engaging in their chosen profession, even in a "narrow" manner or a "limited" way. (See *Edwards*, *supra*, 44 Cal.4th at p. 948.) We thus independently conclude section 3.2 of the CNDA is void under section 16600.

C. *The FAC's First, Third, Fourth, Fifth and Sixth Causes of Action Fail as a Matter of Law*

In light of our decision, we conclude the court properly granted summary judgment on AMN's first cause of action for breach of contract against individual

21

defendants, which alleged that such defendants "breached and, if not stopped, will continue to breach[,] the [CNDA] by soliciting and inducing Traveler employees of [AMN] to become employees of Aya." (¶ 37.) Moreover, to the extent AMN's UCL cause of action in part relied on the allegation that individual defendants violated section 3.2, we conclude that allegation cannot support a UCL cause of action. (See § 16600.)

Our independent conclusion that section 3.2 of the CNDA is invalid under section 16600 also defeats AMN's third cause of action against Wallace for breach of duty of loyalty; and its fourth, and fifth causes of action against defendants for intentional and negligent interference with prospective economic advantage, respectively. Each of these causes of action required AMN to show that the nonsoliciation of employee provision protected confidential information "other than trade secrets," which individual defendants unlawfully used to solicit and recruit AMN's travel nurses.[6]

This court in *Galante* addressed the issue of whether the common law trade secret exception applied to section 16600. We recognized in *Galante* that "*Edwards* did not *approve* the enforcement of noncompetition clauses whenever the employer showed the employee had access to information purporting to be trade secrets. Instead, *Edwards*

---

[6]     See ¶¶ 51 [third cause of action, alleging Wallace breached her duty of loyalty by misappropriating AMN's "confidential and proprietary information — other than Plaintiff's trade secrets — for the purpose of accessing and using such information to *compete with Plaintiff*" (italics added)]; 57 [fourth cause of action, alleging defendants engaged in conduct with the intent to "disrupt Plaintiff's economic relationship with its Travelers . . . by using or relying on Plaintiff's confidential and proprietary information, other than Plaintiff's trade secrets"]; and 64 [fifth cause of action, alleging defendants failed to act with reasonable care and engaged in wrongful conduct "by using or relying on Plaintiff's confidential and proprietary information, other than Plaintiff's trade secrets]."

22

merely stated it was not required to 'address the applicability of the so-called trade secret exception to section 16600' (*Edwards*, *supra*, 44 Cal.4th at p. 946, fn. 4), because it was not germane to the claims raised by the employee." (*Galante*, *supra*, 176 Cal.App.4th at p. 1239.)

This court in *Galante* recognized the "tension" between section 16600 and trade secrets (*Galante*, *supra*, 176 Cal.App.4th at p. 1233), but nonetheless found that section 16600 barred a court from "specifically enforcing . . . a *contractual* clause purporting to ban a former employee from soliciting former customers to transfer their business away from the former employer to the employee's new business, but a court may enjoin *tortious* conduct (as violative of either the [UTSA], Civ. Code, § 3426 et seq.) and/or the unfair competition law) by banning the former employee from using trade secret information to identify existing customers, to facilitate the solicitation of such customers, or to otherwise unfairly compete with the former employer." (*Galante*, at p. 1238.) This court in *Galante* thus concluded that when "[v]iewed in this light," "conduct is enjoinable *not* because it falls within a judicially created 'exception' to section 16600's ban on contractual nonsolicitation clauses, but is instead enjoinable because it is wrongful independent of any contractual undertaking." (*Id.* at pp. 1233, 1238.)

Turning to the instant case, we note that AMN does not even allege in connection with its third, fourth, and fifth causes of action that its trade secrets were used by defendants to solicit and hire AMN's travel nurses. Instead, AMN bases these causes of action on the misuse of its "confidential information," as defined in section 1.2 of the

23

CNDA, to recruit such employees.[7] But as we noted in *Galante*, section 16600 precludes an employer from restraining an employee from engaging in his or her "profession, trade, or business," even if such an employee uses information that is confidential but not a trade secret. We agree with *Galante* and thus conclude the third, fourth, and fifth causes of action fail as a matter of law.

We further conclude AMN's third cause of action for breach of a duty of loyalty against Wallace fails for the separate reason that, to the extent Wallace owed any duty to AMN not to disclose alleged AMN confidential information, that duty arose from the CNDA and any breach of such duty would be grounded in contract, not tort. (See *Aas v. Superior Court* (2000) 24 Cal.4th 627, 643 (*Aas*) [noting " ' "[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies" ' "], superseded by statute on another ground as set out in *Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1079–1080; see also *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515 (*Applied Equipment*) [noting merely breaching an alleged contract does not create a tort cause of action, and further noting "[c]onduct amounting to a breach of contract becomes tortious only when it also

---

[7] We note that, although AMN claims defendants wrongfully used AMN's "confidential information" as defined in section 1.2 of the CNDA "other than trade secrets" in connection with each of these causes of action, *by definition* the term "confidential information" was synonymous with the term "confidential trade secrets," as set forth in the CNDA.

24

violates an independent duty arising from principles of tort law," which duty is primarily to "vindicate social policy"].)

That the trial court did not rely specifically on this ground in granting summary judgment as to AMN's third cause of action does not preclude our doing so in this case. (See *Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 568 (*Belair*) [noting "a ruling or decision correct in law will not be disturbed on appeal merely because it was given for the wrong reason," and further noting "[i]f correct upon any theory of law applicable to the case, the judgment will be sustained regardless of the considerations that moved the lower court to its conclusion"]; see also *Ramalingam*, *supra*, 151 Cal.App.4th at p. 498 [noting a trial court's stated reasons for granting summary judgment are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale"].) Thus, AMN's attempt to turn a garden-variety contract cause of action against Wallace into a tort-based breach of duty of loyalty cause of action fails as a matter of law. (See *Aas*, *supra*, 24 Cal.4th at p. 643; *Applied Equipment*, *supra*, 7 Cal.4th at p. 515.)

We further conclude AMN's sixth cause of action for intentional interference likewise fails as a matter of law. This cause of action alleged Aya interfered with individual defendants' contracts by hiring them away from AMN. As noted, however, under section 16600 individual defendants had the right to engage in their "lawful profession, trade, or business" with Aya, including soliciting and recruiting travel nurses who were on temporary assignment with AMN. For this reason alone, we independently conclude this cause of action must fail.

25

Moreover, AMN's sixth cause of action also fails for the separate reason that Aya did not commit any independent wrongful act in hiring individual defendants to work as recruiters for the company. (See § 16600; see also *Edwards*, *supra*, 44 Cal.4th at p. 944 [noting for a plaintiff to prove an interference was wrongful for purposes of the tort of intentional interference, the plaintiff must show an act that is "independent of its interfering character" that is " 'proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard' [citation]"].)

D. *The FAC's Second Cause of Action for Misappropriation of Trade Secret Fails as a Matter of Law*

AMN detailed its alleged secrets in very general terms. (See *Metro Traffic*, *supra*, 22 Cal.App.4th at pp. 861–862 [rejecting the plaintiff's contention that it had a protectable trade secret, which the plaintiff delineated in "very general terms" that, in the "course of serving as [a radio station's] traffic reporter," the plaintiff learned of the "peculiar requirements imposed by [the radio station] on [the plaintiff's] traffic reporting services," and reasoning that a "stable of trained and talented at-will employees does not constitute an employer's trade secret"].)

As noted, AMN's second cause of action for misappropriation of trade secrets alleged Aya, Stein, and Wallace were in possession of AMN trade secrets including the terms and conditions of AMN's travel nurses' employment with AMN, their placement at various hospitals and other healthcare organizations, their identity, "as well as confidential and proprietary information regarding [AMN's] strategy for competing against other companies in its field, including Aya." (¶ 41.) AMN further alleged such

26

trade secrets were based on "information not generally known within the trade or by other persons or entities who could obtain economic value from their use or disclosure." (¶ 42.)

### 1. Guiding Principles

A cause of action for misappropriation of trade secrets requires a plaintiff to show the plaintiff owned the trade secret; at the time of misappropriation, the information was a trade secret; the defendant improperly acquired, used, or disclosed the trade secret; the plaintiff was harmed; and the defendant's acquisition, use, or disclosure of the trade secret was a substantial factor in causing the plaintiff harm. (*Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 41–43 (*Altavion*); Judicial Counsel of California Civil Jury Instruction (CACI) Nos. 4402 & 4403.[8])

Under Civil Code section 3426.1, subdivision (d), " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or

---

[8]     CACI No. 4402 defines the term "trade secret" as follows:  "To prove that the [*select short term to describe, e.g., information*] [was/were] [a] trade secret[s], [name of plaintiff] must prove all of the following: [¶] 1. That the [*e.g., information*] [was/were] secret; [¶] 2. That the [*e.g., information*] had actual or potential independent economic value because [it was/they were] secret; and [¶] 3. That [*name of plaintiff*] made reasonable efforts to keep the [*e.g., information*] secret."  CACI No. 4403 expands on the "secrecy requirement" as follows:  "The secrecy required to prove that something is a trade secret does not have to be absolute in the sense that no one else in the world possesses the information.  It may be disclosed to employees involved in [*name of plaintiff*]'s use of the trade secret as long as they are instructed to keep the information secret.  It may also be disclosed to nonemployees if they are obligated to keep the information secret.  However, it must not have been generally known to the public or to people who could obtain value from knowing it."

27

potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

The "test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret. [Citation.] . . . [I]n order to qualify as a trade secret, the information 'must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.' " (*DVD Copy Control Assn., Inc. v. Bunner* (2004) 116 Cal.App.4th 241, 251.)

2. <u>Analysis</u>

a. Identity and contact information

The undisputed evidence shows that the identity and contact information of travel nurses that AMN claims to be "secret" for purposes of its trade secret cause of action were already known to Aya *before* any of individual defendants left AMN and went to work for Aya. AMN in its FAC alleged that Stein improperly solicited and recruited on or about June 22, 2015, AMN travel nurses Morris and Meyer (¶ 23); that Hernandez on or about that same date resigned from AMN, joined Aya, and solicited AMN travel nurse Kym Shay, whom Hernandez had "worked with" at AMN; (¶ 29) and that Ogilvie on or about November 4, 2015, resigned from AMN, joined Aya, and solicited AMN travel nurse Sarah Hennis, with whom Ogilvie had worked with while employed by AMN (¶ 30).

28

Aya employee Anna King, who managed Aya's databases and software, declared under penalty of perjury that Morris first applied for employment with Aya on July 15, 2014, or almost a *year before* she was recruited by Stein; that Meyer first applied for employment with Aya on May 23, 2012, or about *three years* before Meyer was recruited by Stein; and that Hennis first applied for employment with Aya on October 14, 2014, or more than a *year before* being recruited by Ogilvie.[9] Thus, with respect to Morris, Meyer, and Hennis, the undisputed evidence in the record shows there was nothing secret about their identities and contact information, as these nurses were already known to, and had sought employment with, Aya, before each individual defendant left AMN and joined Aya.

For this same reason, we reject AMN's contention that its "customer list" was a protected trade secret pursuant to section 16607. Subdivision (a) of this statute provides a customer list, including the "names, addresses and identity of all employer customers who have listed job orders with an employment agency within a period of 180 days prior to the separation of an employee from the agency . . . shall constitute a trade secret and confidential information of, and shall belong to, the employment agency."

Even assuming the AMN travel nurses qualify as "customers" within the meaning of section 16607, subdivision (a), as opposed to "employees" of AMN for purposes of

---

9    Aya had no record in its database of traveler Shay ever working for or being contacted by any Aya employee. The undisputed evidence instead shows Shay initiated contact with Hernandez through personal cell phone messages. Hernandez, however, did not place Shay on any assignment with Aya, or submit Shay for any future placement at Aya, or otherwise enter Shay's information into Aya's database.

29

section 3.2 of the CNDA, as AMN aggressively argued throughout the litigation; and even assuming that AMN qualifies as an "employment agency" within the meaning of this statute, AMN has no legal basis for claiming the names and contact information of Morris, Meyer, and Hennis in Aya's database were somehow AMN's trade secret, when the undisputed evidence shows each of these travel nurses already was known to Aya and was in its database, long before each individual defendant left AMN and went to work for Aya.

Our conclusion that as a matter of law the identity and contact information of AMN travel nurses known to Aya, including the three travel nurses named in the FAC, were not "secret" for purposes of Civil Code section 3426.1, subdivision (d) is further supported by the undisputed evidence that "[i]n the travel nurse and healthcare staffing industry, some travel nurses work with many different healthcare recruitment firms in order to increase the likelihood that they will be placed in assignments which fit their needs"; that "[s]ome travel nurses attempt to simultaneously seek placement through several different healthcare staffing agencies before finally accepting a placement"; that "[s]ome travel nurses disclose to their recruiters the terms of the pay packages and offers presented by competing agencies"; that "[s]ome travel nurses have their contact information listed in the database of AMN, Aya, and other staffing agencies at the same time"; that individual defendants "got to know some travel nurses and other AMN employees on a personal level . . . [¶] [and] became personal friends with several travel nurses with whom each worked with while at AMN"; that "[r]ecruiters sometimes initiate contact with nurses, and nurses sometimes initiate contact with recruiters"; that "[s]ome

30

recruiters, including some of the individual defendants, sometimes have used their knowledge of the names of travel nurses with whom they worked at AMN in order to find that person in Aya's database"; that there "are tens of thousands of names in Aya's database"; and that travel nurses are employed on a temporary basis and as the name *travel* nurse implies, they move around frequently, including not only by location, but from employer to employer.

What's more, many travel nurses — including Hennis — belong to a *public* social media group called the "Gypsy Nurse Group," as noted *ante.* This group is comprised of over 30,000 travel nurses/members. "Because it is a public group, anyone with a[n] . . . account, is, at a minimum, [able to] access . . . the profile names of all 30,000 members as a means of trying to 'friend' or message them." Thus, for example, Ogilvie in December 2015 saw that Hennis had "posted to The Gypsy Nurse Group page, complaining about her assignment with AMN. On Gypsy Nurse, travel nurses exchange information and share experiences regarding different jobs and agencies and other issues relating to travel nursing." Ogilvie in response checked Aya's database, saw Hennis's "information" was in that database, and sent Hennis a message through social media, as they were "friends."

This additional, undisputed evidence further supports our conclusion that the identities of AMN travel nurses on temporary assignment with AMN, and their placement and contact information, are not "secret," such that they "[d]erive[] independent economic value, actual or potential," for purposes of Civil Code section 3426.1, subdivision (d).

31

AMN, however, relies on *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006 (*Cotton*) in arguing the identity and contact information of its travel nurses, and the terms and conditions of their placement, were a protected trade secret. In reviewing a preliminary injunction and deciding the plaintiff (ReadyLink) was likely to prevail on a misappropriation of trade secret claim, the *Cotton* court noted that the defendant, before and after the plaintiff had fired him, used "ReadyLink's databases containing lists of ReadyLink nurses, employees, and healthcare facility customers, compilations of compensation, employment preferences, contact information, nurse applications and tests, and ReadyLink's *unique* per diem program" to solicit illicitly the plaintiff's employees. (*Id.* at p. 1018, italics added.)

*Cotton* is factually distinguishable from the instant case because the employee information there consisted largely of databases containing lists, compilations, and a unique per diem program. (*Cotton*, *supra*, 126 Cal.App.4th at p. 1018.) Here, in contrast, the AMN travel information of Morris, Meyer, and Hennis was *already known* to Aya before individual defendants left AMN to join Aya. In addition, this information was, in any event, "very general" in nature (*Metro Traffic*, *supra*, 22 Cal.App.4th at p. 861); was readily ascertainable on social media and by word of mouth, as evidenced by The Gypsy Nurse Group consisting of 30,000 members; and was acquired by individual defendants, not by accessing proprietary databases such as was the case in *Cotton*, but rather as a result of them working with, and in some cases, becoming personal friends with, travel nurses who, in any event, tended to seek employment with multiple

employers, as was the case here with respect to the nurses named in the FAC. *Cotton* thus does not inform our decision on this issue.

b. September 1, 2015 Wilhelm e-mail[10]

Another category of trade secret information AMN contends was misappropriated related to the alleged confidential Wilhelm e-mail she prepared on or about September 1, 2015. Wallace in turn forwarded this e-mail to an Aya recruiter while she was still an employee of AMN.

The short e-mail provided: "We're seeing an increase in Aya competitives [*sic*] lately. Looks like they are not quoting per diem daily but per shift, making it seem like more per work, but is not. They also have lower the [*sic*] hourly rates. Additionally, we aren't seeing anything about benefits. [¶] To help poke holes, make sure you are asking the following: [¶] 1. [¶] Is Aya quoting you that you will only be taxed at 20%? [¶] 2. [¶] Is Aya saying the per diem is more but are they quoting your per diem per shift or daily? [¶] 3. [¶] Is your housing stipend being quoted per shift or daily? [and] [¶] 4. [¶] Are they offering you[] benefits? [¶] Hope this is helpful!"

We conclude as a matter of law that the information in this e-mail is not a protectable trade secret, as it merely addressed information about *Aya* and some of the terms it used in competing with AMN to recruit travel nurses. In addition, the information in the e-mail is "very general" (see *Metro Traffic*, *supra*, 22 Cal.App.4th at

---

10    Although, as noted, the trial court sustained an objection on the ground of lack of foundation to the e-mail, we nonetheless reach the merits of this issue because it was included as an exhibit in Aya's summary judgment papers. (See fn. 3, *ante*.)

p. 861), as it merely suggested a series of questions that AMN recruiters should consider asking in attempting to "poke holes" in its competitor's efforts to recruit travel nurses, information that, in any event, was routinely shared by travel nurses and was publicly available, as summarized *ante*.

Moreover, there is no evidence Aya ever "obtain[ed] economic value" from the disclosure of such information. (See Civ. Code, § 3426.1, subd. (d)(1).) Indeed, the evidence is undisputed that Aya did not make any changes to its hiring practices *as a result of* the September 1 Wilhelm e-mail, and that Aya did not believe the information in the e-mail held any value, other than being "amus[ing]." For this separate reason, we conclude the contents of the e-mail was not a protectable trade secret of AMN.

c. The "travelers on assignment" (TOA) list forwarded by Wallace

The last potential trade secret at issue is the TOA list Wallace forwarded to her personal e-mail account while employed by AMN, shortly before she accepted employment with Aya. The list included the names and e-mail addresses of some of the travel nurses placed by Wallace. She testified at deposition that it was "foolish" of her to send the list to her home e-mail account. However, in her declaration in support of summary judgment, Wallace testified that she never used any of the information on that list to contact or place a travel nurse, but instead relied on "leads originating from information contained on Aya's databases, from posts on public travel nursing blogs or websites, from referrals from other [t]ravel [n]urses, or from [t]ravel [n]urses directly contacting [her]."

34

In its separate statement in opposition to summary judgment, AMN "disputed" the material fact that Wallace never used or referred to the TOA list in placing candidates for Aya, noting, "Wallace has acknowledged, under oath, that the information she took, including the list of Travelers on Assignment . . . was confidential and that her actions were wrong." AMN also "disputed" this material fact by citing to Wallace's testimony that she targeted an AMN traveler "she located in Aya's database . . . because she remembered information she had learned about her while employed by AMN."

Assuming, without deciding, the TOA list was a protected trade secret of AMN and was subject to the common law trade-secret exception to section 16600, we conclude the undisputed evidence shows AMN was neither harmed by such disclosure nor was such disclosure a "substantial factor" in causing AMN any (presumed) harm. (See *Altavion*, *supra*, 226 Cal.App.4th at pp. 41–43.) That is, while it may have been "wrong" for Wallace to send this information to her home e-mail account, there is no evidence she or Aya ever used or relied on such information to recruit, or attempt to recruit, any of the travel nurses on that list.

In any event, information already in *Aya's* database regarding a travel nurse who Wallace recognized as a result of her working at AMN does not make that travel nurse's information a protectable trade secret of AMN, as the information was not "secret" for purposes of subdivision (d) of Civil Code section 3426.1. Nor was Wallace's use of information in the Aya database (as opposed to any of the travel nurses on the TOA list she sent to her personal e-mail account), improper, merely because she remembered this individual from her prior employment with AMN. (See § 16600; see also *American*

35

*Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622, 634 [noting that "in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect clients against competition from former employees"].)

In light of the foregoing analysis, we independently conclude summary judgment was properly granted on AMN's second cause of action for misappropriation of trade secrets.

E. *The FAC's Seventh and Ninth Causes of Action Against Aya Fail as a Matter of Law*

By virtue of our decision in this case that defendants as a matter of law did not misappropriate any trade secrets of AMN, we further conclude AMN's seventh and ninth causes of action against Aya also fail because each of these causes of action was based on the existence of a viable trade secret that was allegedly misappropriated by Wallace.[11] As such, summary judgment was properly granted as to both of these causes of action.

F. *The FAC's Eighth and Tenth Causes of Action Against Aya Fail as a Matter of Law*

These causes of action allege Aya wrongfully participated under a conspiracy (eighth cause of action) and an aider and abettor (ninth) theory in Wallace's breach of duty of loyalty to AMN when she sent Aya the September 1 Wilhelm e-mail. However,

---

11      See ¶¶ 74 [seventh cause of action for conspiracy to misappropriate trade secrets, alleging "Wallace misappropriated [AMN's] trade secrets by sending Aya an email containing trade secrets regarding [AMN's] strategy for competing with Aya"]; and 82 [ninth cause of action for aiding and abetting misappropriation of trade secrets, alleging same allegation against Wallace as in the seventh cause of action].)

unlike AMN's seventh and ninth causes of action, which alleged the September 1 e-mail was a protected trade secret of AMN, the eighth and tenth causes of action alleged the e-mail was "confidential information" of AMN "other than trade secrets." As noted *ante*, however, the term "confidential information" in section 1.2 of the CNDA by definition included trade secrets.

In any event, we conclude both causes of action fail as a matter of law because to the extent Wallace owed any duty to AMN not to disclose alleged AMN confidential information, that duty arose from the CNDA and any breach of such duty would be grounded in contract, not tort, as we already have explained in connection with the third cause of action against Wallace for breach of the duty of loyalty. (See *Aas*, *supra*, 24 Cal.4th at p. 643; *Applied Equipment*, *supra*, 7 Cal.4th at p. 515; see also *Belair*, *supra*, 47 Cal.3d at p. 568 [finding summary judgment was properly upheld when the decision was correct but was based on different reason(s) than relied on by the trial court]; *Ramalingam*, *supra*, 151 Cal.App.4th at p. 498 [same].)

Furthermore, alleging the existence of a conspiracy or aiding and abetting activity does not turn a garden-variety contract cause of action (against Wallace) into a derivative tort cause of action (against Aya). (See *Applied Equipment*, *supra*, 7 Cal.4th at pp. 510–511 [noting a "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration," and further noting a " ' "civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage" ' "], quoting *Doctors' Co.*

37

*v. Superior Court* (1989) 49 Cal.3d 39, 44; see also *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144 [noting "California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a *tort*" and noting " ' "[l]iability may . . . be imposed on one who aids and abets the commission of an intentional *tort* if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing *a tortious* result and the person's own conduct, separately considered, constitutes a breach of duty to the third person" ' " (italics added)].

G. *The Eleventh Cause of Action Fails as a Matter of Law*

"The UCL does not proscribe specific activities, but in relevant part broadly prohibits 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) ' " 'Because . . . section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " ' [Citation.]" (*Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1184, citing *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel–Tech*).)

" 'By proscribing "any unlawful" business practice, "section 17200 'borrows' violations of other laws and treats them as unlawful practices" that the unfair competition law makes independently actionable.' " (*Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 644.) "Virtually any law—federal, state or local—can serve as a predicate for a [UCL] action." (*State Farm Fire & Casualty Co. v. Superior*

*Court* (1996) 45 Cal.App.4th 1093, 1102–1103, disapproved of on another ground as stated in *Cel–Tech*, *supra*, 20 Cal.4th at pp. 184–185.)  Thus, when the underlying legal claim fails, so too will a derivative UCL claim.  (*Cel-Tech*, at p. 182.)  Because all of AMN's other claims fail as a matter of law, as discussed *ante*, so too must its derivative UCL claim.  (See *ibid*.)

II

Injunctive Relief and Attorney Fees

A.  *Brief Additional Background*

As noted, defendants filed a cross-complaint against AMN asserting causes of action for declaratory relief and unfair competition.  With respect to the declaratory relief cause of action, defendants (as cross-complainants) alleged an "actual controversy" existed between them and AMN "concerning their respective rights and obligations, if any, under the [CNDA] between AMN and [the] four individual Cross-Complainants" with respect to the enforceability of section 3.2.  The UCL claim was similarly premised on AMN's conduct in attempting to enforce section 3.2.  Defendants in their cross-complaint sought injunctive relief and an award of attorney fees, among other relief.

The court subsequently held a hearing based on stipulated facts regarding AMN's continued use and enforcement of section 3.2.  Defendants argued section 3.2 already had been the subject of a separate litigation brought by AMN against a former employee shortly before AMN filed the instant case against defendants.  (See *AMN Services LLC. v. Caitlan Grubaugh* (San Diego County, Super. Ct. case No. 37-2014-00024257-CU-CO-CTL (*Grubaugh*).)  In *Grubaugh*, a different court had granted summary judgment in

39

favor of the former employee, after separately finding that section 3.2 was unenforceable under section 16600 and that the former employee had not misappropriated any AMN trade secrets when she copied for herself a list of travel nurses' e-mail information that she had worked with in the year prior to her leaving AMN, which information she had compiled mostly through social media.[12]

Defendants further argued that during the pendency of the instant case, other former AMN recruiters had sought employment with Aya only to receive from AMN's in-house counsel "cease and desist letters" referencing section 3.2. As such, defendants argued AMN should be enjoined from attempting to enforce this provision not just with respect to individual defendants, but as to all former AMN recruiters (in California) who had signed such a provision. Absent such an injunction, defendants argued AMN would continue to file lawsuits against former employees who left AMN and went to work for a competitor.

After hearing oral argument, considering the parties' trial briefs, the stipulated facts and exhibits, and its earlier ruling finding section 3.2 void under section 16600, the court granted injunctive relief. The court enjoined AMN and its employees and agents "from using, enforcing, or attempting to enforce any contract or employment agreement in the State of California which purports to restrain its former employees from directly or

---

[12] Although the order granting summary judgment in *Grubaugh* was included in the record in the instant case, we have not relied on that order or otherwise considered it in affirming summary judgment against AMN and summary adjudication in favor of defendants.

40

indirectly soliciting or inducing, or causing others to solicit or induce, any employee of AMN to leave the service of AMN."

In a subsequent hearing, the court awarded defendants attorney fees under both Civil Code section 3426.4 and Code of Civil Procedure section 1021.5 in the amount of about $169,000.[13] With respect to the latter statute, the court found the enforcement of California's anticompetition law was an "important right affecting the public interest and that a 'significant benefit' [was] conferred on the general public" as a result. The court also found that "AMN's practices affected not only competitors but private individuals (employees and former recruiters) who were restrained in employment. Thus, the award is appropriate in the interests of justice."

On appeal, AMN contends that the injunction issued by the court is overbroad because it made no allowance for contractual restrictions on employee solicitation using AMN's trade secrets; and that the court erred as a matter of law in awarding fees under either Civil Code section 3426.4 or Code Civil Procedure section 1021.5.

B. *Injunction*

We review the trial court's decision to grant an injunction under an abuse of discretion standard. (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390 (*Horsford*)); *Thompson v. 10,000 RV Sales, Inc.* (2005) 130 Cal.App.4th 950, 964 [noting a court's " 'decision to grant a permanent injunction rests

---

13      The court also awarded defendants about $7,000 in costs that was *not* challenged by AMN in the trial court (or on appeal).

within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion' "].)  Notwithstanding its discretionary component, the evidence must support the trial court's exercise of discretion, and, to the extent the trial court resolved disputed factual issues, we apply the substantial evidence standard of review.  (*Horsford*, at p. 390.)

Here, we conclude the court properly exercised its broad discretion in enjoining AMN from attempting to enforce section 3.2 against individual defendants and others similarly situated.  As we have noted, section 3.2 is void under section 16600 as applied to former employees of AMN, whose "profession, trade, or business" is recruiting and placing nurses (and other professionals) on temporary assignment.

Moreover, the evidence in the record supports the court's exercise of its discretion, as it shows that AMN had previously brought a suit similar to the instant one against former AMN employee Grubaugh, who, like individual defendants in the instant case, had left the company and joined a competitor; and that AMN was continuing in its efforts to enforce section 3.2 against other former employees as well, as demonstrated by the "cease and desist" letters AMN sent their former employees after they accepted new employment with a competitor.  We thus reject AMN's contention that the injunction was overbroad or otherwise imprudently granted.

C.  *Attorney Fees*

It is axiomatic that parties in litigation generally pay their own attorney fees. (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 504.)  Code of Civil Procedure section 1021.5 is an exception to this rule, as it codifies the private attorney

42

general doctrine and acts as an incentive to pursue " ' "public interest-related litigation that might otherwise have been too costly to bring." ' " (*Save Our Heritage Organisation v. City of San Diego* (2017) 11 Cal.App.5th 154, 159 (*Save Our Heritage*).)

Code of Civil Procedure section 1021.5 provides in part: "[A] court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit . . . has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

To obtain fees under Code of Civil Procedure section 1021.5, the moving party must establish all of the following: (1) he or she is a "successful party," (2) the action has resulted in the enforcement of an important right affecting the public interest, (3) the action has conferred a significant benefit on the public or a large class of persons, and (4) an attorney fees award is appropriate in light of the necessity and financial burden of private enforcement. (*Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288, 313.)

Generally, we review for abuse of discretion the trial court's determination whether the requirements under Code of Civil Procedure section 1021.5 have been met (*Espejo v. Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378 (*Espejo*)), unless the resolution of the appeal turns on statutory interpretation. (*Save our Heritage*, *supra*, 11 Cal.App.5th at p. 160.)

43

Here, we conclude the court properly exercised its discretion in awarding defendants their attorney fees under Code of Civil Procedure section 1021.5.[14] Defendants clearly were successful parties within the meaning of the statute, as they prevailed on summary judgment against AMN and on their declaratory relief cause of action in their own cross-complaint. Moreover, as the court found, the instant action involved an important issue affecting the public interest, namely the enforceability of section 3.2, which was included in the CNDA that AMN employees were required to sign as a condition of employment with the company. This posttermination, nonsolicitation of employee provision, if enforced, prevented former AMN employees from recruiting travel nurses and similar professionals who were on temporary assignment with AMN, even if those same travel nurses had applied to, were known by, and/or had previously been placed by, a competitor of AMN, as the instant case aptly shows.

For this same reason, we conclude the court properly found in the exercise of its discretion that the instant action conferred a significant benefit on the public. Our high court in *Edwards* itself noted that California courts " 'have been clear in their expression that section 16600 represents a *strong public policy* of the state which should not be diluted by judicial fiat.' " (*Edwards*, *supra*, 44 Cal.4th at p. 949, italics added.)

The instant action also conferred a significant benefit on a large class of persons, as the court also recognized: namely, all current and former AMN California employees

---

14    Based on our decision, we need not decide whether attorney fees were also properly awarded defendants under Civil Code section 3426.4, the other statute relied on by the court.

44

who had signed a CNDA containing a nonsolicitation of employee provision similar to section 3.2, which restrained their employment for at least one year after leaving AMN; and all California-based competitors of AMN who wanted to hire such former employees (within one year, or 18 months, of their leaving AMN), but were concerned about, or refrained from doing so because of, section 3.2 and the potential risk of litigation resulting from its enforcement.

Finally, the attorney fees award was appropriate in this case in light of the necessity and financial burden of private enforcement. Although defendants clearly had a personal stake in the controversy, the record shows even after they were successful in having summary judgment granted against AMN, they continued the litigation on their cross-complaint, not because they wanted damages or restitution, but because they wanted the trial court to enjoin AMN from seeking to enforce section 3.2 with respect to other former employees of AMN. Absent such an injunction, there was nothing to prevent AMN from suing, or threatening to sue, other current/former AMN California employees who wanted to leave, or had left, its employ and went to work for a competitor recruiting travel nurses and placing them on temporary assignment. We thus conclude the court properly exercised its discretion in awarding defendants their attorney fees. (See *Espejo*, *supra*, 13 Cal.App.5th at p. 378.)

DISPOSITION

The judgment, including the injunction against AMN and award of attorney fees in favor of defendants, is affirmed.  Defendants are awarded their costs on appeal.


BENKE, J.

WE CONCUR:


McCONNELL, P. J.


GUERRERO, J.